## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

MARK EUGENE WOODWORTH,    )
    )
    Plaintiff,    )
    )
vs.    )
    )  Case No.
KENNETH HULSHOF, LYNDEL    )
ROBERTSON, ROCHELLE    )
(ROBERTSON) KOEHLY, BRANDON    )
PATRICK HAGAN, KENNETH    )
LEWIS, GARY CALVERT, TERRY    )
L. DEISTER, R. BRENT ELLIOTT,    )
RACHEL SMITH, JOHN WILLIAMS,    )
DAVID MILLER, LIVINGSTON    )
COUNTY, LIVINGSTON COUNTY    )
SHERIFF'S DEPARTMENT, CITY OF    )
CHILLICOTHE, MISSOURI,    )
CITY OF CHILLICOTHE POLICE    )
DEPARTMENT, JENNY SMITH    and    )
BRUCE CLEMONDS    )
    )
    Defendants.    )

## COMPLAINT
### Civil Rights, 42 U.S.C. 1983, Conspiracy to Violate Civil Rights, False Arrest, Malicious Prosecution, Intentional Infliction of Emotional Distress and Defamation

### Introductory Statement of the Case

Mark Woodworth brings this civil rights case because he was twice wrongfully convicted for murder and other serious offenses. Officials of the criminal justice system in Livingston County, Missouri and other law enforcement officials conspired with civilians, who were acting under color of state law, to cruelly and cold-bloodedly frame Mark Woodworth for crimes he was innocent of. The conspirators accomplished their goals by conducting a sham investigation, fabricating false evidence, suppressing exculpatory evidence and concealing their conspiratorial

acts, until serious Brady violations were uncovered in 2009. After serving nearly 18 years in wrongful incarceration and after years of litigation, all charges against Mark were dropped on July 15, 2014. The allegations in this complaint and their supporting evidence will explain how this happened.

## Jurisdiction and Venue

1.      This is a civil rights action brought pursuant to 42. U.S.C. Section 1983 et seq., 28. U.S.C. Sections 1331 and 1343(a), and the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1331, and supplemental jurisdiction over pendent state claims under 28 U.S.C. Section 1376(a).

2.      Venue is proper under 28 U.S.C. Section 1391(b) because the events giving rise to the Plaintiff's claims all occurred in this judicial district, the Western District of Missouri and at least one of the named Defendants is a resident of this district and all Defendants reside in the State of Missouri.

## <u>Parties</u>

3.      Plaintiff, Mark Woodworth (hereinafter referred to as "Mark"), is, and has been, a resident and citizen of Livingston County, Missouri, except for the times when he was a wrongfully incarcerated prisoner for more than seventeen (17) years in the Missouri Department of Corrections in Jefferson City and Cameron, Missouri.

4.      Defendant, Lyndel Robertson (hereinafter referred to as "Lyndel"), at all relevant times, was and is a resident of Chillicothe, Livingston County, Missouri, and at certain times relevant hereto he was the farming partner of Plaintiff's father, Claude Woodworth.

5.      Defendant Rochelle (Robertson) Koehly (hereinafter referred to as "Rochelle") is the daughter of Defendant Lyndel Robertson, and, at all relevant times, was a resident of Livingston County, Missouri, except for relevant periods in late 1990 and 1991 when she was a college student living in St. Joseph Missouri. She presently resides in Chillicothe, Missouri.

6.      Defendant, Brandon Patrick Hagan, also known as Brandon Patrick Thomure (hereinafter referred to as "Brandon"), at all times relevant to this action, was a resident, inter alia, of Independence, Jackson County, Camden County and Cole County, Missouri.  He presently resides in Independence, Missouri.

7.      Defendant Kenneth Lewis (hereinafter referred to as "Lewis"), at times relevant to this action, was a State of Missouri Circuit Judge of the 43rd Judicial Circuit of Missouri, which includes Livingston County, Missouri, and is now retired, residing in Livingston County, Missouri.  He is sued in his individual capacity, acting under color of state law. At times pertinent hereto he was acting outside the scope of his judicial duties and authority, having been found by the Missouri Supreme Court, by its Special Master, to have assumed the role of a prosecutor.

8.      Defendant, Gary Calvert (hereinafter referred to as "Calvert"), at times relevant to this action was a Deputy Sheriff for Livingston County, Missouri and later became Sheriff of Livingston County, Missouri residing at times relevant to this action in Chillicothe, Livingston County, Missouri.  He is sued both as an individual and in his official capacity as a Deputy Sheriff and the Sheriff of Livingston County, Missouri. At all pertinent times he was acting under color of state law and was a policy-making official within the Livingston County Sheriff's Department. At all pertinent times Calvert was a personal friend of Lyndel.

9.     Defendant, Terry L. Deister (hereinafter referred to as "Deister"), is a private investigator who was hired in 1991 by Defendant, Lyndel Robertson, being hired both to assist in a 1991 civil lawsuit brought by Plaintiff's father, Claude Woodworth against Defendant Lyndel Robertson and also to lead the criminal investigation of Plaintiff regarding the murder and shootings of Defendant Lyndel Robertson and his Wife. At all times pertinent hereto he was acting under color of state law. This shooting occurred on or about November 13, 1990 in Livingston County, Missouri, and will be referred to hereafter as "the Robertson Shootings". At all relevant times he is and was a resident of Platte City, Platte County, Missouri. Deister is, and has been, a personal friend of Lyndel and Calvert.

10.     Defendant, R. Brent Elliott (hereinafter referred to as "Elliott"), is presently a resident of DeKalb County, Missouri, and was at times relevant to this action a resident of Chillicothe, Livingston County, Missouri.  On or about 1992 through 1993, he served as the consultant to an illegal criminal investigation of Plaintiff and was acting under color of state law, was a former prosecuting attorney of Livingston County, Missouri, simultaneously served as the personal private attorney for Defendant Kenneth Lewis. He also served as the Juvenile Court Prosecutor against Plaintiff (having been appointed as such by his client, Defendant Lewis), represented Rochelle Robertson in obtaining an Order of Protection against Brandon and appeared in the sentencing of Plaintiff after his first trial as an assistant to the Special Prosecutor, Defendant Kenny Hulshof. He is sued in his individual capacity and in his official capacity as an agent of the State while acting illegally as a private prosecutor.

11.     Defendant Kenneth Hulshof (hereinafter referred to as "Hulshof") is a resident and citizen of the State of Missouri. At times relevant to this action he was employed by the Office of the Missouri Attorney General and was appointed as a special prosecutor by Defendant

Lewis. At such time he was supervised by then Attorney General Jeremiah (Jay) Nixon, served as a United States Congressman from 1999 through 2008, and is now a private attorney with the Polsinelli law firm in Kansas City, Missouri. As a Special Prosecutor appointed by Defendant Kenneth Lewis, he prosecuted Plaintiff for murder and other charges at Plaintiff's first criminal trial in 1995. At all times hereto, Plaintiff believes he has been a resident and citizen of the State of Missouri, residing within the Western District of Missouri. He is sued in his individual capacity acting outside the scope of his prosecutorial duties and he was at all relevant times acting under color of state law.

12. Defendant, John Williams, at times relevant to this action, was the employee of Defendant, Lyndel Robertson and became Defendant Lyndel Robertson's farming partner after the farming partnership of Defendant Lyndel Robertson and Claude Woodworth was dissolved in 1991. He is sued in his individual capacity.

13. Defendant David Miller, at times relevant to this action, was a police officer hired by the City of Chillicothe Police Department and is a resident of the State of Missouri. He participated in an unfair and improper investigation of Plaintiff, acting in concert with Defendant Gary Calvert and others, and at all relevant times was acting in his official capacity as a member of the Chillicothe Missouri Police Department, as a member of the Northwest Missouri Major Case Squad and as an agent of the Livingston County, Missouri Sheriff's Department, and was acting under color of state law. He is sued in his individual and official capacities.

14. Defendant, Livingston County Sheriff's Department is a municipal organization in Livingston County, Missouri and authorized by the statutes of the State of Missouri.

15. Defendant Livingston County is a municipal organization authorized and existing under the Statutes of the State of Missouri.

16.     Defendant, City of Chillicothe Police Department is a municipal organization under the statutes of the State of Missouri.

17.     Defendant, City of Chillicothe is a municipal organization under the statutes of the State of Missouri.

18.     Defendant Bruce Clemonds was at all relevant times an officer with the Missouri Highway Patrol. To Plaintiff's best knowledge and belief he is a resident of the State of Missouri. He is sued in his individual and official capacity. At relevant times he was acting under color of state law.

19.     Jenny Smith, to Plaintiff's best knowledge and belief, is a resident and citizen of the State of Missouri. At times relevant to this action, she was an employee of the Missouri State Highway Patrol and was acting under color of state law. She is sued in her individual and official capacity.

## Factual Background
## The Robertson Shootings

20.     This action stems from the shootings of Lyndel Robertson (hereinafter "Lyndel") and his Wife, Catherine Robertson (hereinafter "Catherine") on or about midnight, November 13, 1990 at their residence on Highway 190, Livingston County, Missouri.  Lyndel Robertson survived and was an eyewitness to the shootings.  Catherine did not survive.

21.     In the immediate aftermath of the shootings, Scott Robertson, the ten (10) year old son of the Robertsons, heard noises from his parents' bedroom from his adjacent bedroom and then observed that his parents had been shot.  He also reported to police, and later to a hypnotist, that he heard a car start up just outside his bedroom in the front driveway of the home at the time. The significance of this fact is that, because the Mark Woodworth family lived

diagonally just across the road from the Robertsons, the use of a vehicle in the crime likely implicated a suspect other than a member of the Woodworth family

22.     At the time of the shootings Mark's father Claude was Lyndel's farming partner.

23.     Another witness, a neighbor, Roger Wolf, heard an accelerating vehicle speeding away from the Robertson residence around the time of the shootings.

24.     Shortly after the shootings, and in the days following, Defendant Lyndel Robertson reported to police, medical personnel and to several friends and acquaintances that he had seen the shooter and identified that person as Brandon .

25.     Brandon, sixteen (16) years old at the time, was in an explosive romantic relationship with the daughter of Lyndel and Catherine, Rochelle,who was then twenty (20) years old. Both Brandon and Rochelle were extremely upset because she had been forbidden by her parents from continuing the relationship with Brandon. At the time Rochelle was pregnant by Brandon. In the weeks leading up to the shooting Rochelle had expressed to various persons in the Chillicothe area that she and Brandon wished her parents were dead or that someone would kill them.

26.     Prior to the shootings, Catherine had forbidden Brandon from seeing Rochelle because of numerous violent and threatening acts he had committed against Rochelle.  Catherine informed Brandon she was going to obtain an order of protection against him.

27.     A few weeks before the shootings Brandon had threatened to slit Catherine's throat when Catherine refused to allow him to speak to Rochelle on the telephone. At the time Rochelle had been impregnated by Brandon. (After the shootings she underwent an abortion).

28.     Approximately eight (8) days after the shootings, Rochelle, with the assistance of the Robertsons' private attorney, Brent Elliott, obtained an order of protection against Brandon, in which Rochelle alleged that Brandon "may have been" the person who shot her parents.

29.     Shortly after the shootings, Lyndel was in contact with law enforcement officials in Chillicothe and Livingston County and was "adamant" that Brandon be prosecuted for the shootings.

30.     However, within weeks after the shootings, Lyndel inexplicably changed his story to law enforcement. He changed the story by asserting that he had not been able to see or identify the perpetrator. This resulted in the investigation against Brandon being dropped by Calvert. Consequently, Brandon was never charged. Circumstances suggest that at least one of the reasons for this change of heart was that Lyndel wished to prevent his daughter Rochelle from being prosecuted. (Rochelle had been suspected by police as being Brandon's accomplice immediately after the shootings.)

31.     For several years before and at the time of the shootings Lyndel had been involved in a farming partnership with Claude Woodworth, who lived with his family in a residence diagonally across the road from the Robertson residence.

32.     Unbeknownst to Claude Woodworth, Lyndel and John Williams, prior to the shootings, had engaged in a deliberate plan to oust Claude from the farming partnership with Lyndel and form their own farming partnership.

33.     Plaintiff, who was sixteen (16) years old at the time, was not a suspect in the weeks following the shootings and did not become a suspect until after Lyndel changed his mind about the identification and prosecution of Brandon.

### The Aftermath of the Shootings and the Beginning of the Official Law Enforcement Investigation

34.     Local law enforcement responded after midnight to the Robertson residence after receiving a 911 call from another daughter, Rhonda (Robertson) Oesch.

35.     Officers, including Defendants Calvert and Miller, began to examine the crime scene and took certain tire track measurements and photographs from a driveway directly across the road from the scene.

36.     Measurements and photographs of the acceleration marks were taken.

37.     Defendant Miller made a crime scene video of the interior of the residence and the interior of a detached shed, ostensibly to memorialize the crime scene in the same condition it was found. (At both of Plaintiff's murder trials, Miller and Lyndel testified that they discovered boxes of .22 caliber bullets on a work bench in the shed.  Miller claimed he lifted Plaintiff's thumbprint from one of these boxes. However, the crime scene video does not show any bullet boxes on the workbench, suggesting that Miller's testimony and the thumbprint evidence were false and were contrived later to fit the theory of the investigators that Mark was the perpetrator.)

38.     During the remainder of the dark hours after the shootings, Livingston County Sheriff's Deputy Maurice Eskew was tasked with standing guard over the crime scene and interviewing any potential witnesses driving by.

39.     Eskew testified in 2011 at Mark's Habeas Corpus hearing that he was able to observe the front of the Robertson residence from the road. This directly contradicted the false premise and testimony offered by the investigators and the prosecution at mark's trials that it was too dark for any witness who would have been driving by to be able to observe a vehicle at the front of the house. Facts and circumstances suggest that this false evidence was presented as a means of contradicting a defense witness who testified that he was driving by the residence at the time of the shootings and observed a vehicle parked in front of the house.

40.     After the police responded to the crime scene, the Robertson children, Rhonda, Renee, Scott and Roxanne were transported to the home of the Alexanders, who were friends of the Robertson family.

41.     Local police in St. Joseph, Missouri woke up Rochelle at her apartment in the early morning hours on November 14, 1990 to inform her that her parents had been shot. When police arrived she refused to answer the door, necessitating the breaking of the door to gain entrance.

42.     Subsequently, Kevin Price, a friend of the family was dispatched to pick up Rochelle and bring her to Chillicothe.  During this trip, Rochelle falsely informed Price that Brandon could not have done the shootings because she had called and talked to him on the telephone the previous evening at his parents' house in Independence, Missouri after she left work at 10 p.m.  She later changed this story when questioned by police and, instead, asserted that she was too tired to call him when she left work.

43.     Based on Lyndel's identification, investigators immediately centered their attention on Brandon as the primary suspect and the Major Case Squad was activated the next day. Defendant Calvert was assigned the role of lead investigator, thus assuming the role he had typically  of a policy-maker in criminal investigation. Sheriff Leland O'Dell entrusted the supervision and decision making functions in this investigation to Calvert.

44.     While the criminal proceedings were pending against Mark, Calvert officially became the policy maker for the Livingston County Sheriff's Department when he became the elected Sheriff in 2007. As Sheriff he adopted and ratified the numerous wrongful acts committed during the investigation and made them the custom and policy of the Sheriff's Department.

45.     In the early morning after the shootings Rochelle summoned Brandon to the Alexander residence in Chillicothe.  Rochelle and/or Rhonda then took Brandon into the bathroom where she (they) informed him of the questions he would be asked by investigators.

46.     Gunshot residue tests were administered that morning and Brandon was the only one who tested positive for gunshot residue on both hands.  Rhonda Robertson's test was "inconclusive", however, to Plaintiff's best knowledge and belief, Rhonda later inquired of a witness whether a person who merely handled a gun after it had been fired could show a positive result to a gunshot residue test.

47.     Rochelle was interrogated by investigators on November 14, 1990.  During this "interview" Rochelle admitted to investigators that some of her early answers denying the violent and threatening actions of Brandon had been false. This admission occurred after interrogators informed her that they knew she was lying and that they suspected that she was either an accomplice of Brandon's or was "covering up" for him.

48.     On November 14, 1990 Brandon was interrogated by investigators and initially admitted that he had no way to prove that he did not commit the crimes.  Later he informed police that he had an "alibi" for the night of November 13, 1990 which would be provided by his Mother and sister.

49.     None of the alleged alibi witnesses were called at Mark's first trial because the trial judge ruled that Mark could not present evidence implicating Brandon as the alternative perpetrator. (This ruling ultimately resulted in the reversal of that conviction and sentence and the remand for a new trial by the Missouri Court of Appeals.) They did testify at Mark's re-trial in 1999.

50.     Investigators were purportedly assigned to verify this alibi, but failed, either deliberately or negligently, to follow up on numerous investigative leads and witnesses directly contradicting the alibi. Numerous witnesses observed Brandon in Chillicothe shortly before the shootings and in the early morning hours afterwards when, according to his alibi, he was 100 miles away sleeping in his Mother's residence in Independence, Missouri. Regarding at least some of these witnesses, Defendants Calvert and Miller failed to prepare investigative reports. They attempted to discourage or impeach other witnesses in what the circumstances suggest as an effort to cover for Brandon, while publicly (and falsely) proclaiming that his alibi could not be overcome.

51.     At some point within weeks after the shootings, and despite Lyndel's original identification of and demand for prosecution of Brandon, the investigation of Brandon was dropped and Calvert declared that Brandon's alibi was "iron clad".  The Major Case Squad was disbanded and Calvert, along with Miller remained as the investigators involved with the case.

52.     In the initial investigation, bullet fragments removed from Lyndel and Catherine were identified as .22 bullets but were too fragmented to be matched up with any gun.

## The Private Investigator and the Framing of Mark Woodworth

53.     Sometime during January, 1991, Lyndel directed a hired hand, James D. Johnson (hereinafter referred to as "Johnson" (a known career criminal) to contact private investigator Terry Deister, of Platte County, Missouri.  Lyndel later admitted that he had been referred to Deister by his friend, Calvert.  James Johnson inquired of Deister whether he would become involved in the Robertson shooting investigation in consideration for the ten thousand dollar ($10,000.00) reward money put up by Lyndel.  Deister initially refused.

54.     Around this time in early 1991, Lyndel began spreading rumors around the area that he believed that Claude Woodworth was the perpetrator of the shootings.  Calvert came to Claude's front door and informed him that Lyndel was going around town implicating him. Facts and circumstances suggest that this was part of the plan to oust Claude from the partnership on terms favorable to Lyndel,  a plan agreed upon and carried out by Lyndel and his hired hand, Defendant Williams.

55.     Claude then confronted Lyndel and told him he could not be partners with a man who accused him of murdering his Wife.  At this time, Claude was unaware of the plan by Lyndel and Williams, to oust him from the partnership.

56.     In March, 1991 Claude initiated legal proceedings in Livingston County Circuit Court to dissolve the farming partnership.  Judge Lewis presided over this case.

57.     In June, 1991 Claude filed additional allegations asking for a legal accounting, because he had discovered evidence that Lyndel was stealing from him.

58.     In June, 1991 Lyndel then hired Deister, whose involvement assumed a three-fold purpose:

      a.      To assist in the defense of the stealing allegations brought by Claude in the civil suit; and

      b.      To ostensibly conduct a criminal investigation to "solve" the Robertson shooting case, but which became, instead, a scheme to frame one of the Woodworths for the crimes of murder etc. Circumstances suggest that their purpose was to facilitate the elimination of Claude as a partner on terms favorable to Lyndel and Williams.

      c.      To deflect blame for a wide-spread farm products theft scheme away from Lyndel and to frame Plaintiff and Claude for acts of stealing which had been committed by Lyndel and Johnson.

59.     As part of this plan, Johnson was later utilized by the state, with the specific knowledge of Hulshof and Lewis, to assist in obtaining a criminal indictment of Claude and Mark for farm theft, a charge which eight (8) years later was dropped. To Plaintiff's best knowledge and belief Lyndel hired local attorney Gene McFadin to represent Johnson in regard to criminal charges in which Johnson was involved and criminally charged in a multi-county operation to steal farm products. McFadin worked out a plea bargain for Johnson, with the assistance of Defendant Calvert which required Johnson to "snitch" against Mark and his father both as to the Robertson shootings and as to numerous stealing charges. At the time, McFadin (now deceased) was providing legal representation to Mark in the Robertson shooting case. Circumstances suggest that this egregious conflict of interest was known of and condoned by Defendant Lewis and state prosecutors, although the conflict was never disclosed to Plaintiff or his father. Lyndel knew or should have known that McFadin was serving as the defense attorney for Plaintiff.

60.     During the period from 1991 through 1993, Johnson had been investigated and prosecuted for multiple acts of farm theft throughout several counties in Northwest Missouri. He later sent letters to the Court, Mark's prosecutor Hulshof and the Livingston County Grand Jury explicitly setting forth the fact that he had been involved in stealing with Lyndel for several years.

61.     Defendant Lewis issued an order that these letters were to be sealed ,"gagging" anyone from disclosing the letters. Those letters remained undisclosed by state prosecutors until

2011 when Plaintiff's attorneys were allowed discovery of them by a Special Master appointed by the Missouri Supreme Court.

62.    Lyndel admitted to both Deister and Calvert (both being personal friends of his) that he had been involved in stealing other people's farm products, yet he was never formally investigated nor did Calvert seek to have him criminally charged.

63.    The following circumstances, among others, suggest that Deister's specific purpose was to "put a case on" (or "frame") one or more of the Woodworths:

a.    In 1980, Deister had been forced to resign as a Platte County Sheriff Vice Squad Detective after the FBI revealed information that Deister was "promoting prostitution". According to the 2011 deposition testimony of Calvert, Deister was less than truthful about this background information.

b.    Deister and Calvert made a pact to conceal Deister's involvement from Calvert's boss, Sheriff Leland O'Dell and from the Missouri Highway Patrol.

c.    They proceeded under the belief that Mark was mentally handicapped and, therefore, less capable than any other member of the Woodworth family to defend himself. They believed that they would be able to trick and/or coerce Mark into confessing to the crimes, which they attempted during two separate interrogations of Mark, in addition to a phony polygraph examination by Defendant Clemons.

d.    Before both interrogations Deister and Calvert "staked out" the Woodworth residence to ensure that Mark, who was 16 years old at the time of the shootings, would be alone when they detained him for

interrogation, even though they were aware that the Missouri Juvenile Code provided that either the Juvenile Officer and/or Mark's parents were to be notified.

e.      Deister and Calvert's pact included the explicit assumption that evidence implicating Brandon or another perpetrator, did not even exist, thus opening up the investigative avenues to pursue the prosecution of Mark. Their plan involved creating pretextual reasons supporting probable cause to arrest Mark. According to Calvert that probable cause consisted of alleging that Mark's boots resembled boot prints which Calvert alleged he observed at the scene of an alleged act of vandalism on Lyndel's property. According to Deister's records and his 2011 testimony the probable cause consisted of the false assertion that Mark fit a "profile". Deister was unable to identify any such profile in testimony before the Special Master in 2011.

f.      Consistent with this agreement, Deister and Calvert, along with Defendant David Miller, deliberately failed to follow up on and/or report a plethora of credible witnesses and evidence directly contradicting Brandon's "alibi" and establishing Brandon and Rochelle's intention and motive to murder Catherine Robertson.

g.      Deister and Calvert surreptitiously and improperly removed the official investigative files from their rightful custody within the Livingston County Sheriff's Department and entrusted them without documentation to Deister's sole possession for an indeterminable period of time.

h.   Entrusted improperly and without documentation a bullet allegedly

removed from Lyndel in August of 1992 to the conflictually employed

Deister in order to obtain a ballistics examination of the purported bullet

by a personal friend of Deister's in England, Roger Summers and ballistics

expert Steven Nicklin.  (Two separate ballistics examiners in Missouri,

Todd Garrison of the Missouri State Highway Patrol and John Cayton of

the Kansas City Missouri Police Department, had failed to establish a

conclusive link between the purported bullet and a .22 Ruger revolver

owned by Claude Woodworth.)

i.   When Nicklin revealed the same inconclusive result, Deister used his

influence to succeed in obtaining an "upgraded" result that his ballistics

testing revealed a "strongly suggestive" link with the Woodworth gun.

Deister not only spent approximately eight (8) days in England attempting

to influence Nicklin, but he also sent a letter to Nicklin's boss in which he

improperly set forth details of his "theory" and the case, including the

assertion that he "knew" he had the murder weapon (Woodworth's),

"knew" they had the murderer (Mark Woodworth) and all they needed

was the expert's assistance in connecting the ballistics in order to make the

case.  They would be unable to make the case without this assistance.

Desiter was successful in persuading Nicklin to change his original report

by stating that his tests "strongly suggested" a connection to a .22 caliber

Ruger handgun owned by Mark's father.

j.      Deister never interviewed Brandon, any of Brandon's alibi witnesses or any witnesses refuting the alibi.

k.      Similarly, Defendant Calvert, despite his specific knowledge that Brandon's purported alibi had never been thoroughly checked out and that several witnesses had reported to him that Brandon was in Chillicothe both the night of and in the early morning hours after the shootings, made public statements that Brandon would not be charged because his alibi had been checked out and was "airtight".

### The Improper "Private" and Judicial Influence in the Criminal Investigation and Prosecution of Mark Woodworth—The Involvement of Others, Including Defendant, Kenneth Lewis and His Personal Private Attorney, Defendant Brent Elliott

64.      Deister, Calvert, Lyndel and Williams engaged in a series of meetings and consultations regarding the secret criminal investigation with private attorney, Brent Elliott, who was also serving at the time as the personal attorney representing both the private and official interests of Defendant Lewis.

65.      During this period of time, the consultations included both face to face meetings and telephone conferences involving, inter alia, Elliott, Deister, Calvert, Lyndel and his then farming partner, John Williams. These meetings all took place away from the Livingston County Sheriff's Department, consistent with the agreement to keep Deister's involvement and the investigation a "secret".

66.      Elliott served as "consultant" to the improper and secret criminal investigation of Mark Woodworth being conducted by Deister and Calvert. They concealed this investigation from the duly elected county prosecutor, Doug Roberts, whom they knew had refused to

prosecute Mark for the shootings. (Elliott had formerly served a term as the elected prosecuting attorney of Livingston County). Circumstances suggest that Lewis was aware of these meetings and the illegal and improper private investigation and prosecution of Mark.

67. These circumstances include the following:

a.     Lewis had been using Elliott to gather information to be used against his political opponents.

b.     These opponents included the Livingston County Commissioners with whom Lewis had been involved in a property dispute over a road used for years by local fishermen to access the Thompson River.  The road ran through a duck hunting property owned by Lewis.

c.     In 1990, after the Commissioners declared the road a "public" road and informed Lewis he would have to remove road barricades he had erected, Lewis sued the Commissioners in federal court for defamation and alleged illegal interference with his duties as a Judge.  Elliott assisted Lewis in gathering evidence to support the allegations in that lawsuit.

d..     After a federal jury exonerated the Commissioners , Lewis utilized Elliott to seek the involvement of the Missouri Attorney General's in criminally prosecuting the Commissioners for misuse of county funds.  (Elliott had been a law school friend of then Missouri Attorney General Jeremiah (Jay) Nixon, who referred Elliott to one of his assistants, attorney Larry Weber.)

e,      During the improper investigation of Mark Woodworth, the timing of the consultations with Elliott suggest that he consulted with Deister immediately before Deister prepared two (2) letters to Judge Lewis for Lyndel (in 1992 and 1993 respectively).

f.      These letters complained that then County Prosecutor, Doug Roberts, (hereinafter "Roberts") showed a lack of interest in prosecuting Mark Woodworth and sought Lewis' assistance in obtaining Roberts' disqualification from involvement in the Robertson shooting case.

g.      Deister, during this period of time also prepared a letter to Forensic Science Services (where his friend Roger Summers was a supervisory official) in which Deister discussed in detail his theory of Mark's guilt, discussed his belief as to the ineptitude of the county prosecutor and stated that they had no case against Mark without Summers' assistance.

68.     Coupled with Lewis' apparent intimate knowledge of detailed facts about the case, the specific charges, the statute of limitations and his assumed role as a "prosecutor, the circumstances suggest the knowledge and involvement of Lewis in this illegal and unfair investigation.

## Criminal Proceedings against Mark Woodworth

69.     After the juvenile certification proceedings, Plaintiff was indicted by a Livingston County grand jury, was arrested and charged with Murder 1st Degree, Assault 1st degree, Armed Criminal Action and Burglary 1st Degree.

70.     Plaintiff was convicted by a jury in 1995 of Murder 2d degree, Burglary 1st degree, Assault 1st degree and Armed Criminal Action. The jury recommended the minimum sentences. The Court ordered them to run consecutively for a total of 31 years.

71.     This conviction was reversed in 1997 by the Missouri Court of Appeals for the reason, inter alia, that Mark had been unfairly deprived by the trial court of his right to present evidence of an alternative perpetrator (Brandon).

72.     By the time the case came up for re-trial, Hulshof had been elected to the U.S. Congress and the second trial was prosecuted by Rachel Smith, an assistant special prosecutor employed by the Missouri Attorney General's office.

73.     The second trial, in 1999, resulted in jury verdicts of guilty as to the same charges, but the jury recommended the maximum sentences. The trial court ordered the sentences to be served consecutively this time as well resulting in sentences which were the equivalent of 145 years.

74.     These convictions were affirmed by the Court of Appeals in 2001.

75.     Mark filed a post-conviction relief motion in 2001 which was not concluded in the Clinton County Circuit Court until 2007. Mark appealed the denial of that motion, said appeal being pending in the Missouri Supreme Court at the time habeas relief was granted.

76.     In 2009 Mark learned that an Associated Press reporter had discovered the "Lewis Letters" while reviewing the files of the Missouri Attorney General.

77.      Mark then filed a series of state habeas corpus petitions which resulted in an order in 2009 by the Missouri Supreme Court appointing a Special Master to conduct an

evidentiary hearing regarding Mark's allegations that the State had suppressed exculpatory evidence and that he had an unfair, biased judge at critical stages of the juvenile and criminal proceedings.

78. During the discovery process in the habeas corpus proceedings, Mark learned that the state through investigators and/or prosecutors had suppressed additional exculpatory Brady evidence.

79. Mark presented evidence to the Special Master at a hearing from May 31 through June 3, 2011.

80. In April, 2012, the Special Master filed findings and a recommendation to the Missouri Supreme Court that Habeas Corpus relief be granted, that the conviction and sentence be vacated and that the case be reviewed by an independent prosecutor as to whether Mark should be re-tried. The Special Master based his recommendations on several main points, including, but not limited to, the following:

> a. There had been a number of Brady violations which seriously prejudiced Mark and had pervaded both trials.
>
> b. There had been an unfair, biased investigation, led by a private investigator hired by the surviving victim (and thus laboring under a clear and actual conflict of interest which was known to law enforcement officers and prosecutors). Investigators had "deep-sixed" evidence and witnesses which were inconsistent with the theme of the investigation— "Get Mark Woodworth". This evidence included witnesses who contradicted the alibi of the original suspect and who were knowledgeable of his motive to murder Catherine.

      c.      Judge Lewis had abandoned his role as an impartial arbiter, had assumed the role of a prosecutor even before Mark was indicted, had ignored Mark's rights to Due Process and that no one involved in the investigation had an "inkling" of the requirements of Due Process;

      d.      Mark had been seriously prejudiced by "bizarre" conflicts of interest;

      e.      Had there been no Brady violations, had there been a fair investigation and had there been a fair judge from the outset—"…no jury would have convicted Mark Woodworth."

81.      In January 2013, the Missouri Supreme Court accepted the findings of the Special Master, vacated Mark's conviction and assigned the case to Honorable Judge Owens Lee Hull, Jr. of the Platte County Circuit Court after the Attorney General announced its intent to retry Mark a third time.

82.      In April, 2014, Judge Hull modified the original appointment of the Attorney General and appointed a special prosecutor.

83.      In July, 2014, the special prosecutor dismissed all charges against Mark by nolle prosequi, publicly stating that "the wrong man had been charged from the beginning and that there had never been any probable cause to charge Mark with these crimes."

## The Direct Involvement of Judge Lewis

84.      Lewis' personal attorney, Defendant Elliott, served as a legal consultant to the investigation of Mark being led by Deister from 1992 through 1993.

85. On or about September, 1992, Deister prepared a letter for Lyndel to Lewis alleging that Roberts, the county prosecutor was not doing his job, was unfit to be a prosecutor and urged Lewis to take steps to remove Roberts as the prosecutor. The letter also set forth certain allegations suggesting that Mark was the guilty culprit.

86. Deister prepared a second letter for Lyndel which was sent to Lewis in September, 1993 again calling for Roberts' ouster as prosecutor and alleging that Roberts had a lack of interest in Lyndel's case. Shortly after receiving this Lewis called Roberts to his chambers and successfully pressured him to withdraw as prosecutor, thereby providing Lewis with the statutory authority to appoint a special prosecutor.

87. Roberts responded to Lyndel's 1993 letter in a letter to Lewis, in which he announced that Lyndel's stated grounds for his self-disqualification would not ordinarily be sufficient cause to disqualify himself, but under the "unusual circumstances" of this case, he was nonetheless disqualifying himself.

88. In that same letter, Roberts reminded Lewis that Lyndel was the same man who, shortly after the crimes, had been over here (to the courthouse) and was "adamant" that we charge another young man.

89. After accepting Roberts' self-disqualification Lewis then appointed Defendant, special prosecutor, Kenneth Hulshof (hereinafter "Hulshof"). Lewis then sent to Hulshof an order appointing Hulshof as the special prosecutor. Along with that order Lewis also sent Hulshof a copy of Lyndel's September 1993 letter, a copy of Roberts' letter and a letter of his own addressed directly to Hulshof, which falsely asserted that Roberts had "boycotted" his grand jury (the grand jury he called to hear evidence against Mark.). Thus, Hulshof was specifically on notice that Lyndel, the State's only eyewitness, had not only previously identified an alternative

perpetrator but had demanded that he be prosecuted. Coupled with the fact that Hulshof had engaged in several telephone conversations with Judge Lewis about this case even before he was appointed as special prosecutor the circumstances suggest that not only was Hulshof made aware of the serious weakness presented by the prior identification of someone known by Lyndel but knew that his task would be to suppress that evidence. Circumstances suggest that Hulshof was made specifically aware, even before his official prosecutorial duties began, that Lewis was in violation of several provisions of the Missouri Code of Judicial Conduct, including improper ex parte communications with a witness/victim, his continued involvement in the criminal process against Mark and his bias. Despite his ethical duty to report those violations, he chose not to and, instead, proceeded as though they had not occurred.

90.     These letters became known as the "Lewis Letters", which Hulshof admitted, and the Missouri Supreme Court found were, in fact, Brady material, should have been turned over to the defense, and were not turned over.

91.     Circumstances suggest that Lewis expected Hulshof, and Hulshof agreed, to find a way to conceal the fact that Lyndel had not only previously identified Brandon but had gone so far as to demand of law enforcement that he be prosecuted, an obvious factor in Roberts's decision not to prosecute Mark Woodworth.

92.     As part of a conspiracy and plan agreed to by Lewis, Hulshof and Lyndel to conceal this exculpatory evidence from Mark, circumstances suggest that Lyndel was "coached" by prosecution agents into testifying that investigators had never actually asked him if he saw who did it, only who COULD have done it and that he had "never pointed my finger at anybody." This false testimony was first given in a pre-trial deposition attended by Hulshof and remained consistent through both of Mark's criminal trials. Circumstances suggest that this plan

called for Lyndel to falsely testify in a 2006 deposition that he was never made aware that Doug Roberts had refused to prosecute Mark Woodworth. Circumstances suggest that this was intended to continue to conceal both the prosecution's presentation of a false version of the facts and the Brady violations. (Lyndel admitted this falsehood in a 2011 deposition pursuant to the habeas case.)

93.     Neither Hulshof nor any state prosecutor ever corrected these untruths.

94.     Circumstances suggest that, in furtherance of the plan, Hulshof and/or Lewis ordered either that no transcripts of State's witnesses' testimony at the grand jury were to be produced to the defense or that they be concealed or destroyed. (According to the grand jury's foreman, John Cook, a court reporter transcribed ALL witness testimony at that grand jury proceeding.) The only transcripts provided to the defense were those containing the grand jury testimony of Mark's parents, Claude and Jackie Woodworth, proving that at least 2 grand jury witnesses' testimony were in fact prepared.

95.     Judge Lewis empanelled a grand jury in Livingston County on or about October 15, 1992, amid leaked rumors that murder indictments were "expected."

96.     The grand jury indicted Mark, charging him with Murder 1st Degree, Assault 1st Degree, Armed Criminal Action and Burglary 1st Degree. (On information and belief, several months later the same sitting grand jury indicted both Mark and Claude for farm theft. These charges were dismissed approximately 8 years later).

97.     After Mark was indicted, it was necessary to initiate adult certification proceedings in the juvenile court because Mark was only sixteen (16) years old at the time of the alleged offenses.

Case 5:14-cv-06090-REL   Document 1   Filed 08/11/14   Page 26 of 64

98.    To effectuate Mark's certification to stand trial as an adult Judge Lewis, while presiding over the proceedings, appointed his personal attorney, Elliott, to be the prosecutor for the Juvenile Officer seeking Mark's termination. As mentioned, Elliott had served as legal representative for Rochelle in the order of protection proceedings against the alternative perpetrator and had served as legal consultant to the biased and improper investigation of Mark led by Deister, all while serving as Lewis' personal attorney.

99.    Despite his constitutional duty, Elliott never produced to the defense during the certification proceedings exculpatory evidence which had been concealed before the certification proceedings, even though the circumstances suggest he was aware of its existence, in particular the reported violations of the protective order.

100.    Mark was represented by conflicted attorney Gene McFadin at the juvenile proceedings and during the first criminal trial.  McFadin presented no evidence or arguments to defeat the certification nor did he seek to discover any information about the case.

101.    As noted above McFadin was representing James Johnson during the same time period on farm theft charges in Holt County, Missouri in which he participated in arranging a plea bargain calling for Johnson to testify against his other client, Mark Woodworth. These facts were specifically known by Judge Lewis inasmuch as Lewis presided over Johnson's guilty plea and sentencing in Circuit Court in another county. No one ever disclosed this actual conflict to Mark.

102.    Judge Lewis, Judge Griffin (the trial judge at both murder trials), Hulshof and the state prosecutor at Plaintiff's second trial, Rachel Smith, were, or should have been aware, of this conflict of interest because their files contained the Johnson letters to Hulshof and to the Grand Jury, the "Lewis Letters" and Judge Lewis' "gag order" prohibiting anyone from revealing these

letters. They knew, or should have known, as representatives of the state that Johnson had made a deal to testify against Mark while McFadin was simultaneously representing Mark and Johnson. However, they concealed this fact from the defense and made no attempt to put this conflict on the record, despite a constitutional and ethical duty to do so.

103.    It was part of a conspiracy and plan that none of these letters or the actual conflict of interest would ever be disclosed to the defense, even though they were highly exculpatory and revealed a total disregard for Mark's right to Due Process.

### The Conspiracy to Frame Mark Woodworth

104.    Beginning in early 1991, Lyndel, John Williams, Calvert, Johnson and Deister entered into an agreement and initiated a conspiracy to frame Mark and/or Claude Woodworth for the Robertson shootings and for various criminal acts of farm products theft. They each committed overt acts in furtherance of the conspiracy. Other conspirators later joined in the conspiracy.

### Goals of the Conspiracy

105.    Circumstances suggest that the goals of the conspiracy included the following:

a.    To deflect blame from Lyndel's daughter, Defendant Rochelle Robertson for her involvement in and/or knowledge of the shootings of her parents. Under the circumstances this necessarily involved making whatever efforts were necessary to also deflect blame from Rochelle's boyfriend, Defendant Brandon Hagan, in order to ensure he did not implicate Rochelle in the shootings;

Case 5:14-cv-06090-REL   Document 1   Filed 08/11/14   Page 28 of 64

b.      To utilize the law enforcement mechanisms of Livingston County, Missouri to frame Mark and/or Claude Woodworth for the shootings and for the farm products theft scheme in which Lyndel, his hired hand Johnson and others were involved and of which Chief Deputy Gary Calvert was specifically aware;

c.      To frame the Woodworths and make them scapegoats for the widespread stealing in order to deflect blame from Lyndel Robertson's involvement in (and Calvert's knowledge of and inaction) regarding the stealing scheme.

d.      To achieve the ouster of Claude Woodworth from the partnership on terms favorable to Lyndel Robertson.

## Overt Acts in Furtherance of the Conspiracy

## Calvert, Deister, Williams, Elliott and Lewis

106.    One of the first overt acts in furtherance of the conspiracy was the spreading of rumors in the Chillicothe community by Lyndel and Gary Calvert that Claude Woodworth was the person who murdered Catherine and shot Lyndel.

107.    Next, in June, 1991, Lyndel hired Deister, pursuant to Calvert's recommendation, for the dual purposes of, first, defeating Claude Woodworth's allegations that Lyndel had stolen from the partnership and had "cooked the books" and, second, to frame the Woodworths for the shootings and for the numerous acts of farm theft which Lyndel, Johnson and others had committed. (Claude had filed a lawsuit in March, 1993 to legally dissolve the farming partnership with Lyndel and, in June, 1993 filed another lawsuit for a formal legal accounting

from Lyndel. Claude made it clear that he believed Lyndel had stolen money from the partnership.)

108. As a condition of Deister's involvement in the criminal investigation of the shootings, Calvert and Deister agreed on two key conditions:

  a.   They would keep Deister's involvement in the investigation a secret from Sheriff Leland O'Dell and the Missouri Highway Patrol. This was likely due to Deister's unsavory past which involved his 1980 resignation from the Platte County, Missouri Sheriff's Dept. where he had served as a detective in charge of the vice squad, after the FBI released information that Deister was "promoting prostitution".

  b.   That they would assume that evidence which pointed to a suspect or suspects other than Mark Woodworth did not even exist, thereby permitting them to build an unhampered criminal case against Mark.

109. In furtherance of the above agreements, Calvert agreed to (and did) surreptitiously remove the investigative files accumulated and maintained by the Livingston County Sheriff's Dept. and, without authorization, legal authority and/or documentation, entrust them to the sole custody of Deister. (Deister, in 2011 testimony before the Missouri Supreme Court's Special Master, described this as a "middle of the night park bench drop-off.").

110. The conspiracy involved keeping the duly elected county prosecutor, Doug Roberts, unaware of their illegal and improper criminal investigation.

111. Instead, in 1992 and 1993 Lyndel, Calvert, Williams and Deister regularly consulted about the "investigation" with private attorney R. Brent Elliott, who was a former county prosecutor and the personal attorney for defendant Judge Lewis. Elliott thereby assumed

the improper and illegal role of a "private prosecutor", which was specifically prohibited by the Missouri Supreme Court in a 1976 opinion, State v. Harrington, 534 S.W.2d 44 (Mo. 1976). Circumstances suggest that Elliott's actions were indicative of his agreement to become a part of the conspiracy.

112.    The consultations included both telephonic and face to face meetings. The circumstances suggest that Elliott, who regularly served as Judge Lewis' "eyes and ears" in the community, kept Lewis informed of the investigative results. (The Special Master found that Lewis, even before Mark was indicted for Murder, was inexplicably and improperly aware of details of the shootings, including the exact charges and the applicable statutes of limitations and, by his pre-indictment actions had assumed the role of a prosecutor, contrary to and outside the scope of his duty to be unbiased.)

113.    In August, 1992, Lyndel allegedly had a .22 caliber bullet surgically removed from his body. Lyndel alleged that this bullet had remained in the area around his liver ever since the 1990 shootings. Although the bullet was actually given to Deister by the attending nurse, Calvert falsely prepared a report and testified at both of Mark's murder trials that he was the one who had received the bullet from the nurse. The chain of custody documents attached to that bullet contain no documentation of any of the many transfers of that bullet, including its original possession by Deister and a later possession by Deister when he transported the bullet to a ballistics examiner in England. (The bullet and all ballistics testing results were excluded as evidence from the criminal case in April, 2013 by Judge Owens Lee Hull, Jr., who found that the state had not shown any evidence of the "provenance" of that bullet.)

114.    During the time period of the surgery Deister was scouring the areas around the Robertson and Woodworth residence with a metal detector, suggesting that the tested bullet was

not the bullet actually removed from Lyndel and that the ballistics evidence was fabricated by Deister, Calvert and others. In addition, Hulshof and Smith failed to disclose to the defense known questions about the chain of custody of the ballistics evidence, another Brady violation.

115.    As part of the conspiracy, Deister enlisted the services of a personal friend in England, Roger Summers, who was a Supervisor for a company called "Forensic Science Services" to provide ballistics comparisons between the bullet and a .22 caliber Ruger revolver owned by Claude Woodworth. Testing had been already completed by the Missouri Highway Patrol and ballistics examiner John Cayton, both of whom found that the comparison between the bullet and Claude Woodworth's .22 Ruger revolver was "inconclusive".

116.    After the alleged surgery, Deister sent two letters to Roger Summers. In one letter, Deister specified, inter alia,  that he was involved in the criminal investigation, indicated that he knew who the shooter was (Mark), knew they had the gun (Claude's), that two previous ballistics examinations had proved "inconclusive" and that without Summers' help they would not be able to convict Mark. (It is unethical for a prosecutor (or his agents) to attempt to influence an expert and unethical for a ballistics expert to allow himself to be influenced in his opinions. Deister acted throughout the investigation as an agent of the prosecution.)

117.     The other letter was a copy of a letter Deister had prepared for Lyndel Robertson to send to Judge Lewis dated September, 1992, in which Deister urged Lewis to remove Doug Roberts from the case and explaining Roberts' ineptitude as a prosecutor.

118.    Both letters were in the files of Forensic Science Services and were obtained from that organization in 2011during the habeas corpus proceedings..

119.    Roger Summers assigned the ballistics testing to Steve Nicklin, whose initial opinion was identical to that of the two previous examiners---"inconclusive".

120.     Deister travelled to England and spent 8 days attempting to influence Nicklin to upgrade his opinion. Nicklin then prepared a second report in which he changed his opinion of "inconclusive" to "strongly suggestive" of a connection between the bullet and the Woodworth gun. "Strongly Suggested" is not a recognized category by any legitimate expert organization, such as the Association of Firearms and Toolmark Examiners (AFTE). Nevertheless, this specious ballistics comparison became the key piece of physical evidence which led to the false arrest, charging, indictment and ultimate convictions of Mark for Murder and other serious charges.

### Judge Kenneth Lewis

121.     Circumstances suggest that Judge Lewis committed numerous acts in furtherance of the conspiracy all of which were outside the scope of his authority and duties as a judge, in the following respects:

> a.      Before charges were filed against Mark, Lewis entertained prohibited ex parte contacts from Lyndel, Deister and Elliott, yet did not take the required step of disqualifying himself from further involvement in the arrest and charging of Mark;
>
> b.      Enlisted others, including Hulshof and Elliott, to join the conspiracy.
>
> c.      Served as the de facto, decision-making prosecutor during the investigative and charging phase of the criminal process. Lewis knew, or should have known that the investigation was being led by a private investigator laboring under a clear conflict of interest who was in regular consultation with Lewis' own personal attorney, Elliott;

Case 5:14-cv-06090-REL   Document 1   Filed 08/11/14   Page 33 of 64

d.       Wrongfully used his political influence to pressure the duly elected county prosecutor, who had refused to prosecute Mark Woodworth, to disqualify himself from the case, thus opening the door to the appointment of a special prosecutor who would willingly join in the goals of the conspiracy by presenting a false version of the facts. (The Special Master made a finding that Judge Lewis had abandoned his role of impartiality and assumed the role of a prosecutor. This finding was adopted by the Missouri Supreme Court.)

e.       Lewis improperly usurped the unfettered statutory discretion of said county prosecutor to decide whom and whom not to charge with crimes.

f.       On information and belief, he ordered the destruction or concealment of grand jury records, thus concealing false testimony and concealment of exculpatory evidence. He acted outside the scope of his authority by doing so, in that Missouri Statutes require the maintenance of such records.

g. Ordered the concealment of the Johnson letters, which contained explosive impeachment evidence which could have been effectively utilized by the defense to attack the credibility and motives of Lyndel, Deister and the investigation and prosecution as a whole.


**Kenny Hulshof**


122.    The above overt acts were adopted and carried forth by Hulshof and Rachel Smith.  Prior to his appointment as Special Prosecutor and before he had any prosecutorial duties in the case, Hulshof engaged in a series of telephone conversations with Judge Lewis about the

case. Circumstances suggest that the issues discussed between Lewis and Hulshof during these conversations included the problem posed by Lyndel's previous identification of (and demand for the prosecution of) Brandon Hagan, boyfriend of his daughter Rochelle Robertson. This fact, if known to the defense, would have seriously undermined any prosecution of Mark, as it did when Roberts decided previously not to charge Mark.

123.     Circumstances further suggest that, even before he was legally authorized to act as a prosecutor Hulshof agreed to join the conspiracy by agreeing to conceal the Lewis letters and to assist Lyndel in providing false testimony and evidence that he had never, in fact, identified or "pointed the finger" at Brandon (or anyone else). At a pre-trial deposition in 1995 at which Hulshof was present, Lyndel testified to a substantially different version of events, wherein he stated that he was only asked by police who "could have" been the shooter and that he had "never pointed my finger at anybody." Lyndel maintained this version of events throughout the criminal proceedings against Mark. Because the state had never provided the defense with the Lewis letters and other exculpatory evidence, Mark was deprived of powerful evidence which, according to the findings of the Special Master, would have seriously undermined Lyndel's credibility and provided evidence of his motive to testify falsely.

124.     After he was officially appointed as special prosecutor Hulshof, Smith, Calvert and Deister continued to further the conspiracy in the following respects:

a.     They condoned, participated in and adopted, as supervisory officials of the State of Missouri, the improper influencing of expert witnesses.

b.     Failed to instruct investigating officers to thoroughly verify the purported alibi of Brandon, even though his file contained investigative reports

regarding witnesses who had observed Brandon in Chillicothe the night of and the morning after the shootings.

c.     Gave false and misleading testimony at the Special Master's evidentiary hearing and in pre-hearing depositions in 2011 that the Lewis letters had been provided to the defense before Mark's first and second trial. This testimony was given as private citizens and at a time when Hulshof and Smith were not acting as a prosecutors in the scope of their prosecutorial duties, and constituted an attempt to conceal the conspiracy, to deprive Mark of his rights to Due Process and to keep Mark wrongfully incarcerated.

d.     Concealed other exculpatory or impeaching evidence contained in letters in his files from Johnson which implicated Lyndel in farm products stealing activities. This information would have substantially augmented defense efforts to impeach Lyndel's credibility and would have supplied a credible motive for Lyndel to frame Mark and Claude Woodworth. It also would have augmented an attack on Calvert's credibility and the good faith of the investigation he was supposed to be officially in charge of, because circumstances suggest that Calvert, who was Lyndel's personal friend, knew of Lyndel's illegal activities but chose not to charge him.

e.     Concealed the fact that Calvert relinquished (and Deister assumed) control of the investigation, which would have shown the perversion of the integrity of the system by ill-motivated private influence.

**Rochelle Robertson**

125.    The morning after her mother was murdered Rochelle was interrogated by law enforcement officers about her relationship with and knowledge of Brandon Hagan. During this interrogation she gave false information that Brandon had never been violent to her and had never threatened her mother, when, in fact, that was false. She admitted these falsehoods after interrogators informed her of their belief that she was lying, either because she was an accomplice in the shootings with Brandon or was "covering up" for him.

126.    On the morning after the shootings she summoned Brandon, a known suspect, to the home of the Alexander family, where she was staying temporarily, pulled him into the bathroom and proceeded to tell him the questions he would be asked by police. Circumstances suggest that this was an attempt to conceal Brandon's and her involvement in the shootings by getting their "stories straight".

127.    Rochelle concealed from police her pre-shooting statements to several persons that she and Brandon were upset with her Mother because she had forbidden her from continuing to date Brandon because of his violent behavior, that they wished she were dead, or that someone would kill her.


128.    Approximately 8 days after her mother was murdered, Rochelle obtained, with Elliott's legal assistance, an order of protection against Brandon, in which she stated her belief that Brandon may have killed her mother.

129.    After Mark had been charged with murder, Rochelle gave false deposition testimony that she had never reported violations of the order of protection by Brandon to

authorities when in fact she had reported four different instances of threats by Brandon, one of which resulted in Brandon being criminally charged. Said false testimony was intended to help exculpate Brandon as the perpetrator and herself as an accomplice and, directly or indirectly, to assist in the wrongful prosecution of Mark. This falsehood was enabled by the undocumented transfer of the order of protection court file to a different county court and by the state's failure to produce the exculpatory material to the defense. Defendant Calvert was specifically asked by a defense investigator before Mark's first trial if he knew of any violations of the order. Calvert falsely denied the fact, another overt act in furtherance of the conspiracy to frame Mark and deny him his rights to Due Process.

### Missouri Highway Patrol Officer Jenny Smith

130.    Smith committed overt acts in furtherance of the conspiracy by agreeing to present false, unsubstantiated expert ballistics testimony at both of Mark's criminal trials when she knew or should have known that there were serious questions about the provenance of the critical bullet and about the improper influence exerted on the state's ballistics experts. She agreed and conspired to present false and unsupportable testimony that Brandon could have tested positive for gunshot residue as a result of pumping gasoline from a pump, when it is scientifically impossible to do so. (Brandon was the only person of several who were tested whose gunshot residue results were positive within 12 hours of the shootings.) She also presented false and misleading testimony that Brandon's gunshot residue test results were invalid because the test was not administered within 6 hours after the shootings.

131.    Said testimony was given in order to maximize the chances of obtaining the wrongful conviction of Mark Woodworth and to falsely absolve Brandon and Rochelle of guilt for the crimes, thus furthering the conspiracy and its goals.

### City of Chillicothe Police Officer David Miller

132.    Miller committed overt acts in furtherance of the conspiracy in the following particulars:

a.      Miller, in agreement with Defendant Calvert, deliberately participated in the concealment of reports of violations of Rochelle's protective order by Brandon which were reported to him by Rochelle.

b.      Miller deliberately failed to prepare reports regarding information given to him within weeks after the shootings by witnesses who were aware of statements by Rochelle expressing that she and Brandon wished her Mother was dead or that someone would kill her.

c.      He gave false testimony at both of Mark's murder trials that, while acting as crime scene investigator the night of and morning after the shootings, he found boxes of .22 bullets on Lyndel's workbench and that he lifted a thumbprint allegedly of Mark from one of the boxes, when, in fact, a crime scene video he made of the scene depicts the workbench with no boxes of bullets on it.

d.      He concealed the fact that numerous friends and acquaintances of Lyndel knew that he had admitted seeing the shooter and that it was Brandon. The

Special Master made a finding that this fact was widely known by the law enforcement community and within the court house community in Livingston County, a finding accepted by the Missouri Supreme Court.

e.     Gave false trial testimony that he was able to determine that the thumbprint allegedly lifted from the box of .22 bullets on the workbench were so fresh that he could opine that the print was only a few weeks old.

f.     These actions and omissions were known or within the exercise of reasonable diligence should have been known and were, in fact, ratified by the policy making official of the Chillicothe Police Department, the Chief of Police.

**John Williams**

133.   In furtherance of goals of the conspiracy, including ousting Claude Woodworth from the farming partnership with Lyndel so that he could enter into a partnership of his own with Lyndel, Williams committed the following, but not limited to, overt acts:

a.     Gave false testimony at both trials that Lyndel had not identified Brandon as the shooter, falsely testifying that his brother, Neal Williams, had lied about that fact;

b.     Participated in and received profits from the farm products stealing scheme with Lyndel and Johnson and, along with and in agreement with Calvert, concealed these facts.

c. Participated in meetings with Calvert, Deister, Lyndel and Elliott. Circumstances suggest that his agreement and purpose was to further the conspiracy's goals of preparing false evidence, obtaining false murder and stealing charges against Mark Woodworth, ousting Claude from the partnership and absolving Lyndel of responsibility for the stealing scheme.

d. Upon information and belief Williams participated with Lyndel in transferring and concealing assets of the partnership and of Lyndel with the goal of thwarting Mark's ability to obtain compensation for his wrongful prosecution, convictions and for the nearly 18 years of illegal confinement suffered by Mark.

e. Concealed exculpatory evidence.

**Defendant Terry L. Deister**

134. In addition to the acts and omissions described above, Deister committed the following overt acts in furtherance of the conspiracy:

a. Gave false testimony at pre-trial hearings, and at pre-trial and post-trial depositions for the purpose of obtaining and upholding the wrongful convictions of Mark Woodworth, regarding the issues of whether there was even probable cause to arrest Mark and whether Mark's statements to interrogators (of which he was one) were properly obtained;

b.      Circumstances suggest that he assisted in the preparation of false ballistics evidence by producing a bullet for examination which was not the bullet removed from the body of Lyndel Robertson;

c.      Failed to check out exculpatory evidence and evidence which was inculpatory as to Lyndel, Brandon and Rochelle while falsely representing that he had done so;

d.      Improperly, surreptitiously and illegally took possession of investigative files and materials from the Livingston County Sheriff's Department pursuant to an agreement with Chief Deputy Gary Calvert to improperly keep his involvement in the investigation of Mark a secret.

## Gary Calvert

135.    In addition to the above described acts and omissions, Calvert was a policy maker for Livingston County and the Livingston County Sheriff's Department, in that he served as Chief Deputy in charge of investigating serious felonies, was the lead investigator in the Robertson shooting case, and served as the head of the Major Case squad which had been assembled to investigate the shootings. In addition, when he became the elected Livingston County Sheriff in 1997, he ratified and adopted as the custom and practice of the Livingston County Sheriff's Department and Livingston County the wrongful conspiratorial acts described herein, continued to conceal exculpatory evidence, testified falsely at Mark's second trial in 1999 and made every effort possible as a policy maker to conceal the multitude of wrongful acts which resulted in Mark's wrongful convictions and sentences.

## Rachel Smith

136.     Rachel Smith was assigned by the Missouri Attorney General's Office to try Mark's second trial after the first conviction was reversed and remanded for a new trial in 1997 by the Missouri Court of Appeals, Western District.

137.     Although she is not being sued for her misconduct in her role as prosecutor, she engaged in overt acts in furtherance of the conspiracy to wrongfully convict Mark Woodworth, which included acquiescing in the suppression of exculpatory evidence and presenting alibi evidence for Brandon which she knew or reasonably should have known was false. She prepared a pre-trial "to-do" list which included the following---"**Set up** an alibi for Brandon." She ignored investigative reports containing the statements of credible witnesses which directly contradicted the alibi.

138.     Smith is, however, being sued for conspiring to and giving false testimony in 2011 at the evidentiary hearing before the Special Master, in which she falsely testified that the Lewis letters were in her file, that she offered Mark's defense counsel the opportunity to review her "open file" and that it was never reviewed by defense counsel.

139.     However, in a pre-hearing deposition in 2011 she testified that she did not know or remember when the first time she saw the Lewis letters. The Special Master found that the letters were not in her file, were not produced to the defense and, because they were not included in her extensive discovery inventory letter to defense counsel, the letters were, as admitted by Hulshof, never produced to the defense. Said conspiracy and agreement to provide false,

misleading testimony as a witness for the state was not within the scope of her duties as a prosecutor.

## Defendant Brandon Hagan (a/k/a "Thomure")

140.    Brandon committed overt acts in furtherance of the conspiracy to wrongfully convict Mark Woodworth by giving false and misleading answers to police, by falsely testifying at Mark's second trial that he was at home in Independence, Missouri (approximately 100 miles from the scene of the crime) at the time of the shootings and by threatening witnesses, including Rochelle Robertson, not to tell the truth about him to investigators and at Mark's trial.

141.    Since the crime Brandon has admitted to several persons that he was the perpetrator of the Robertson shootings.

142.    Brandon was aided in his efforts, and acted with others, to deflect blame from himself and Rochelle, by allowing Mark Woodworth to be wrongfully charged and convicted of the shootings by Gary Calvert, Rachel Smith, Terry Deister, Lyndel Robertson, Rochelle Robertson and others.

143.    On information and belief Brandon has threatened witnesses who he believed implicate him in the shootings.

## Missouri Highway Patrol Officer Bruce Clemonds

144.    Clemonds led a pretextual interrogation of Mark under the false representation that,  if Mark agreed to undergo a polygraph examination, he would be released on bond. Along

with co-conspirators Calvert and Deister, and in complicity with Mark's conflicted attorney Gene McFadin, he administered a sham polygraph examination in an attempt to trick or coerce Mark into confessing to the shootings.

145.    At trial Clemonds gave testimony which he knew or should have known would improperly inform the jury that Mark had failed a polygraph examination by stating words to the effect that "now that we both know" you did the shootings would you like to tell the truth. Said highly improper testimony appears to have been deliberately elicited by Rachel Smith for the purpose of prejudicing Mark in the eyes of the trial judge and the jury.

## Damages

146.    As a result of the Defendants' unconstitutional conduct, Mark spent over 17 years incarcerated for crimes he did not commit. Mark was deprived of income and suffered severe economic harm. He was forced to suffer indescribable, mental anguish, emotional pain, separation from his family and friends and was forced to live in an environment wherein he risked assaults on a regular basis. Mark was deprived of the normal enjoyments of the best years of his life, from age 19 through age 38, in that he was unable to be married or have complete relations with members of the opposite sex, start and raise a family of his own or pursue a meaningful and gainful career. Mark was, instead, forced to live in a hopeless and confined environment not knowing if he would ever get out of prison alive.

147.    Mark's damages include, but are not limited to, past and future income loss, loss of economic opportunities and earning capacity, exorbitant attorney fees and court costs which

were expended to contest the false charges and convictions, loss of enjoyment of life, emotional distress, mental anguish, humiliation, loss of freedom, and loss of reputation.

**COUNT I**

**42 U.S.C. Sec. 1983**

**Destruction and/or Suppression of Exculpatory Evidence**

**(5th and 14th Amendments-Procedural Due Process)**

**(Against Defendants Hulshof, Rachel Smith, Calvert, Deister, Miller, Lewis and Elliott)**

148.    Mark hereby incorporates each of the allegations of this Complaint as if fully set forth herein.

149.    As more fully set forth above, throughout the investigation of Mark, Defendants Calvert, Deister, Rachel Smith, Hulshof, Lewis and Miller concealed and suppressed exculpatory and impeaching evidence in violation of Mark's fundamental right to Due Process. This includes, but is not limited to the suppressed evidence described above and below.

150.    Defendants Calvert and Miller concealed both by not preparing and by preparing incomplete investigative reports of witnesses who gave them credible information which directly contradicted Brandon's alibi and which ascribed a motive for Brandon and Rochelle to murder Catherine Robertson and shoot Lyndel.

151.    They did not disclose to the defense crucial witness statements nor did they or Elliott (in his role as Juvenile Prosecutor) disclose numerous reports of Brandon's threatening behavior to Catherine and Rochelle Robertson, including reported violations of the order of protection against Brandon. Calvert and Miller, acting in their investigative capacity, were

specifically aware of Rochelle's complaints that Brandon threatened her, yet denied these facts when asked directly about them by an investigator for the defense.

152.     Defendants Calvert, Lewis, Hulshof and Rachel Smith concealed and failed to disclose the "Lewis Letters" to the defense, even though they knew that said letters contained vital information that Lyndel, as the survivor of the shootings and only witness, had not only identified Brandon as the actual perpetrator but had demanded to authorities that Brandon be prosecuted for the crimes. By concealing these letters they deprived Mark of powerful information by which the defense could have challenged the fairness and legality of the grand jury and its indictment by showing that the process had been perverted by the improper actions of an unfair Judge who had wrongfully assumed the role of a prosecutor.

153.     Calvert, Lewis, Hulshof and Rachel Smith concealed the actual conflict of interest wherein Mark's attorney, McFadin, simultaneously represented a witness in arranging leniency from the State in exchange for his agreement to incriminate Mark.

154.     Defendants Calvert, Deister (acting as an agent of the State), Miller, Hulshof and Rachel Smith concealed exculpatory information that there were "questions" about the chain of custody of the bullet which allegedly connected Mark to the crime and asserted to the Court and the defense, instead, that chain of custody was proper both as to the ballistics and fingerprint evidence.

155.     The acts and omissions described herein violated Mark's right to procedural due process and a fair trial, as guaranteed by the 5th, 6th and 14th Amendments to the U.S. Constitution,  were in bad faith and with the intent to deprive Mark of a fair trial and to prevent Mark from ever obtaining legal relief.

156.    The acts and omissions of each of the Defendants named in this Count were the direct, legal and proximate cause of Mark's injuries as described herein.


## COUNT II

## Fabrication of Evidence

## (14th Amendment—Substantive Due Process)

## (Against Defendants Calvert, Deister, Jenny Smith, Miller and Elliott)


157.    Mark hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

158.    As more fully set forth above, throughout the investigation of Mark, Defendants Calvert, Deister, Miller and Elliott fabricated evidence, including, but not limited to, the following:

> a.    Circumstances suggest that Calvert and Deister improperly "coached" Lyndel to recant his original identification of Brandon and, instead, assert under oath and at trial that he had never identified or "fingered" Brandon as the perpetrator.

> b.    Circumstances suggest that Calvert and Deister fabricated ballistics evidence by concealing chain of custody evidence regarding the bullet allegedly connecting Mark to the crimes and by substituting a bullet which they believed would be connected to Mark.

> c.    Circumstances suggest that a thumbprint which was allegedly removed from a box of .22 bullets found on a work bench in Lyndel's shed was planted.

The fingerprint card, which was purported by Miller to contain Mark's thumbprint, did not contain a the required date submitted or the Missouri Highway Patrol control number as did the other 12 fingerprint cards supposedly submitted at the same time. The signature (initials), although purporting to be from the same writer as the other 12 cards, appears to be a different handwriting and in a different ink.

d.      Circumstances suggest that Calvert and others assisted Brandon in the presentation of a false and fabricated alibi.

e.      Jenny Smith presented false and fabricated testimonial evidence that a gunshot residue test taken more than 6 hours after the shooting was invalid and that Brandon could have tested positive as a result of pumping gasoline.

f.      Miller presented false and fabricated testimonial evidence that he was able to determine that Mark's alleged thumbprint was left on the box of shells a very short time before he lifted it.

g.      Circumstances suggest that Elliott, as legal consultant to the sham private investigation, knew of and agreed to facilitate the fabrication of false evidence, the suppression of exculpatory evidence and the framing of Mark.

159.    As head of the Major Case Squad, Chief Deputy and ultimately the Livingston County Sheriff, Calvert was deliberately indifferent to and/or approved of the described fabrication of evidence. As a policy-maker for the Sheriff's Department and Livingston County, Calvert adopted, approved and ratified this conduct, which became the custom and policy of the Sheriff's Department and Livingston County.

160. The acts and omissions described herein were committed with deliberate indifference to Mark's constitutional rights and violated his right to substantive due process.

161. The fabrication of evidence and testimony resulted in the initiation and continuation of wrongful criminal proceedings against Mark and his over 17 years of wrongful incarceration for crimes he did not commit.

162. The acts and omissions of each of the Defendants named in this Count were the direct, legal and proximate cause of Mark's injuries as described herein.

## COUNT III

### 42 U.S.C. Sec. 1983

### Reckless or Intentional Failure to Investigate

### (14th Amendment-Substantive Due Process)

### (Against Defendants Calvert, Deister, and Miller,)

163. Mark hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

164. As more fully set forth above, throughout the investigation and both trials Defendants Calvert, Deister, Calvert and Miller recklessly and/or intentionally failed to conduct a fair, good-faith , thorough and complete investigation that would have resulted in criminal charges of the known, actual perpetrator of these crimes, Brandon.

165. The Defendants named in this Count purposefully ignored evidence establishing Mark's innocence and implicating Brandon (and possibly Rochelle), applied pressure on

witnesses implicating Brandon and contradicting his alibi in order to negate, destroy and/or weaken their testimony.

166.    This included the failure to follow up on witnesses who contradicted Brandon's alibi and/or ascribed a motive to Brandon and Rochelle.

167.    The actions and omissions described herein were committed with deliberate indifference to Mark's constitutional rights.

168.    The acts and omissions described herein violated Mark's rights to substantive due process.

169.    The failure to investigate caused the initiation and continuation of criminal proceedings of Mark despite his obvious and known innocence of the crimes.

170.    The acts and omissions of each of the Defendants named in this Count were the direct, legal and proximate cause of Mark's injuries as described herein.


**COUNT IV**

**42 U.S.C. Sec. 1983**

**Malicious Prosecution**

**(4th, 6th and 14th Amendments)**

**(Against Defendants Calvert, Deister, Miller, Lewis, Lyndel Robertson and Elliott)**


171.    Mark hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

172.     As more fully set forth above, Defendants Calvert, Deister, Miller, Lewis, Lyndel and Elliott maliciously caused the initiation and continuation of a baseless prosecution against Mark without probable cause.

173.     As more fully set forth above, Defendant Lewis acted wholly outside the scope of his judicial duties as a State of Missouri Circuit Judge, illegally and improperly assumed the role of prosecutor, and ignored Mark's rights to due process and fundamental fairness, including the right to a fair and impartial judge. He is, therefore not entitled to the absolute immunity he would have enjoyed if he had acted within the proper scope of his duties. As the prime policy maker for the criminal justice system in Livingston County, Missouri he adopted, utilized, ratified and approved the wholesale denial of Mark's constitutional rights.

174.     As more fully set forth above, Mark suffered injuries of a constitutional magnitude as a direct and proximate result of the conduct of the Defendants named in this Count, including the right to be free from prosecution and incarceration without probable cause and the unlawful deprivation of liberty, and the right to due process and a fair trial.

175.     The acts and omissions described herein were committed with deliberate indifference to Mark's constitutional rights.

176.     The acts and omissions of each of the Defendants named in this Count were the direct, legal and proximate cause of Mark's injuries as described herein.

## COUNT V

### 42 U.S.C. Sec. 1983

### Conspiracy to Deprive Constitutional Rights

### (Against All Defendants)

177.     Mark incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

178.     As more fully set forth above, Defendants Lyndel Robertson, Calvert, Deister (along with Johnson) and Williams formed a conspiracy and agreed to fabricate evidence against Mark and Claude Woodworth, to suppress evidence against the actual perpetrator(s) of the shootings, including Brandon and  possibly Rochelle, to suppress exculpatory evidence as to Mark, to subvert the normal and proper judicial processes by such acts as conducting improper ex parte contacts with Judge Lewis and enlisting his assistance in framing Mark Woodworth and concealing their conspiracy and plan to ensure that Mark would never be freed from his wrongful incarceration.

179.     Additional co-conspirators were recruited and agreed to join the conspiracy, including Elliott, who assisted Calvert, Deister and Williams in carrying out the goals and purposes of their conspiracy by serving as a de facto private prosecutorial advisor to their biased and improper investigation of Mark.

180.     Circumstances suggest that, in a series of telephone conversations occurring before Hulshof was appointed, Lewis recruited Hulshof, and Hulshof agreed to join the conspiracy by presenting a false version of the facts, namely that Lyndel had not previously identified or demanded the prosecution of Brandon and suppressing evidence that Lyndel had, in fact, previously identified Brandon as the shooter.

181.     By agreeing to join the conspiracy before he had any prosecutorial duties (and in violation of the procedures required by the Missouri Attorney General's Office calling for the random selection of a special prosecuting attorney) Hulshof relinquished the absolute immunity

that would apply to a prosecutor acting within the scope of his prosecutorial duties. Before his appointment by Lewis, Hulshof had NO prosecutorial duties.

182.    Circumstances suggest that Rachel Smith later agreed to join the conspiracy by continuing to suppress exculpatory evidence and to take steps to conceal the conspiracy by agreeing to testify in Mark's habeas corpus hearing that she had, in fact, properly disclosed the "Lewis Letters" to the defense, at a time when she had NO prosecutorial duties.

183.    Defendant Jenny Smith and agreed to join the conspiracy by fabricating false testimonial evidence regarding Brandon's positive gunshot residue test results.

184.     Defendant Clemonds agreed to join the conspiracy by his above described actions in conducting a phony polygraph test in order to try to trick or coerce Mark into confessing the crime. Circumstances suggest that he was rehearsed and agreed to blurt out at Mark's trial testimony improperly implying that Mark had failed a polygraph test.

185.    Circumstances suggest that Defendant Brandon Hagan (Thomure) agreed to become part of the conspiracy by giving false alibi testimony against Mark at trial.

186.    The Defendants, as set forth more fully above, conducted multiple meetings throughout the investigation and prosecution of Mark to discuss the case, and, in many cases to "get their stories straight".

187.    As more fully set forth above, throughout the investigation of Mark the Defendants conspired to fabricate evidence against Mark and to deliberately fail to conduct a fair investigation which would have exonerated Mark.

188.     As more fully set forth above, the Defendants conspired to cause the initiation and continuation of a baseless prosecution against Mark without probable cause.

189.     As more fully set forth above, at least one of the Defendants named in this Complaint engaged in an overt act in furtherance of the conspiracy.

190.     The acts and omissions described herein were committed with deliberate indifference to Mark's constitutional rights.

191.     The acts and omissions described herein caused the initiation and continuation of the prosecution of Mark despite his known and obvious innocence.

192.     The acts and omissions of each of the Defendants named in this Count were the direct, legal and proximate cause of Mark's injuries as described herein.


**COUNT VI**

**42 U.S.C. Sec. 1983**

**Monell**

**(14th Amendment-Procedural/Substantive Due Process)**

**(Against Defendants Calvert in his official capacity, Defendant Livingston County Sheriff's Department, Defendant Livingston County, Defendant City of Chillicothe Police Department, Defendant City of Chillicothe, Defendant Lewis in his official capacity, Defendant Hulshof in his official capacity and Defendant Rachel Smith in her official capacity)**


193.     Mark incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

194.     For purposes of this Count defendants Calvert, Lewis, Hulshof and Rachel Smith are sued in their official capacity.

195.     Defendant Calvert, as Chief Deputy Sheriff in charge of all criminal investigations for the Livingston County Sheriff's Department during the period of the criminal investigation of Mark and as the elected Sheriff during Mark's second trial, had final policy making authority for the Livingston County Sheriff's Department regarding the customs, rules, practices and policies that govern the investigators and officers in the Livingston County Sheriff's Department, and as head of the Northwest Missouri Major Case Squad in the investigation of Mark, had such authority over officers involved in that Squad, including Defendant Miller.

196.     Defendant Lewis, as presiding Missouri Circuit Court Judge of the 43rd Judicial Circuit of Missouri had policy making authority regarding the customs, rules, policies and practices that govern the criminal justice system in Livingston County, Missouri.

197.     Defendants Livingston County and Livingston County Sheriff's Department, through Defendants Calvert and Lewis, adopted policies, practices and customs which operated to deprive Mark of his constitutional rights.

198.     Defendants City of Chillicothe and Chillicothe Police Department, which knew or should have known of the unconstitutional activities of Defendant Miller, adopted the unconstitutional policies, practices and customs of Defendant, all of which operated to deprive Mark of his constitutional rights.

199.     Defendants City of Chillicothe, Chillicothe Police Department, Livingston County and Livingston County Sheriff's Department are accountable under 42 U.S.C. Sec. 1983 because they intended to and did encourage, endorse, and/or reward their agents and employees for violating Mark's constitutional rights and those of other similarly situated persons.

200.     The unconstitutional policies and practices include, but are not limited to:

a.      suppressing, destroying or otherwise concealing exculpatory evidence, including interviews with key witnesses providing potential exculpatory or impeaching information from the defense and/or limiting defense access to such meaningful evidence;

b.      fabricating evidence;

c.      using coercive interrogation techniques;

d.      failing to investigate leads to exculpatory evidence and/or to develop inculpatory evidence against other suspects;

e.      improperly training its agents and employees in the techniques and procedures of reliably investigating and preserving evidence;

f.      failing to discipline officers and agents who violate the constitutional rights of suspects;

g.      being deliberately indifferent to violations by its law enforcement officers of the constitutional rights of accused persons;

h.      condoning favoritism in the decision regarding which persons are charged with crimes and which are not;

i.      allowing judges to regularly usurp the authority and statutory discretion of county prosecutors in their decision-making as to whom gets charged with crimes and whom does not;

j.      condoning and approving of the injection of private influence in the administration of law enforcement and criminal justice;

k.      allowing investigators to be involved in the investigation of crimes involving their personal friends;

l.     allowing officers to "moonlight" as private investigators despite the potential for conflicts of interest.

201.    The policies, practices and customs described in this Count were adopted prior to the commencement of Mark's investigation and with deliberate indifference to Mark's constitutional rights and the rights of similarly situated persons.

202.    Defendants City of Chillicothe, Chillicothe Police Department, Livingston County and Livingston County Sheriff's Department are accountable under 42 U.S.C. Sec. 1983 because they, through Defendants Calvert, Lewis and Miller were deliberately indifferent to an obvious need to train investigating officers to avoid constitutional violations arising from the utilization of improper investigative techniques, the failure to document and disclose witness statements and interviews providing exculpatory evidence, the practice of preserving evidence and ignoring investigative leads which could prove an accused person to be innocent.

203.    The Defendants in this Count were on actual or constructive notice that there were omissions and flaws in their training programs, causing employees to violate citizens' constitutional rights, due to the pattern of constitutional violations arising from the utilization of improper interview and evidence gathering techniques as set forth above.

204.    The Defendants named in this Count disregarded the obvious need for training in these matters and continued to retain and adhere to the constitutionally deficient training programs. This continued pattern was carried out with deliberate indifference to the rights of Mark and others similarly situated.

205.    The actions and omissions of each of the Defendants named in this Count were the direct, legal and proximate cause of Mark's injuries as described herein.

## COUNT VII

## Missouri Common Law

### False Arrest

### (Against Defendants Calvert, Deister and Miller)

206. Mark hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

207. Defendants Calvert, Deister (who acted under color of state law and as an agent of the Livingston County Sheriff's Department) and Miller, acting in concert with each other, did willfully and unlawfully under the color of legal authority illegally arrest and/or cause the illegal arrest of Mark and detained him against his will without due and legal process, and without probable cause.

208. The Defendants' conduct was the direct, legal and proximate cause of Mark's injuries as described herein.

## COUNT VII

## Missouri Common Law

### Malicious Prosecution

### (Against Defendants Calvert, Deister, Elliott, Miller, Lyndel Robertson)

209. Mark hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

210. Defendant Lyndel Robertson, acting in concert with the other Defendants did willfully, maliciously and unlawfully cause Mark to be falsely prosecuted in Court.

211.    Lyndel and other Defendants named in this Count, fabricated evidence, suppressed evidence of Mark's innocence, presented false testimony to the grand jury, the court and jury in order to have Mark wrongfully convicted of serious charges , despite their knowledge that Mark was innocent.

212.    These unlawful, cruel, cold-blooded and malicious acts resulted in wrongful prosecution, abuse of process, wrongful conviction and wrongful imprisonment of Mark.

213.    Mark received a favorable outcome of these wrongful charges when the Missouri Supreme Court vacated his convictions in January, 2013 and the Special Prosecuting Attorney dismissed all charges against Mark on or about July 15, 2014.

214.    The Defendants' conduct was the direct, legal and proximate cause of Mark's injuries as described herein.

215.    The malicious, cruel and cold-blooded conduct of the Defendants in causing the conviction and incarceration of a man they knew to be innocent justifies an award of punitive damages.


**Prayer for Relief**


WHEREFORE, Plaintiff Mark Woodworth respectfully prays this Court for the following relief:

a.  Assume jurisdiction of this cause to determine this controversy and case for hearing on the merits;

b.  Award compensatory and actual damages to Plaintiff, and against the Defendants, jointly and severally;

c.  Award punitive damages to Plaintiff and against the Defendants, jointly and severally.

d.  Award to Plaintiff his costs and attorneys' fees, pre-judgment interest, all other damages allowed by law, and such other and further relief that the Court deems appropriate.

## Jury Demand

Plaintiff demands trial by jury as to all issues so triable under Federal Rule of Civil Procedure 38(b).

..

Respectfully Submitted,


**Law Office of Robert Brooks Ramsey, LLC**


By: _____
       Robert B. Ramsey, #28312
       1010 Market St.  13th floor
       St. Louis, Mo.   63101
       Collinsville, IL 62234
       314-368-7634-Phone
       rbramsey7@gmail.com

       *and*

       **MICHELE C. PUCKETT, P.C.**

       Michele C. Puckett-Burkhead, #45150
       616 Lana Drive
       Cameron, MO 64429-0607

816-632-5297-Phone
816-632-5308-Fax
mcpuckett2@gmail.com