**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION**

| | |
|---|---|
| MARK EUGENE WOODWORTH, | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 4:14-cv-06090-FJG |
| | ) |
| KENNETH HULSHOF, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Pending before the Court are (1) Defendant Kenneth Hulshof's Motion for Summary Judgment (Doc. No. 225); and (2) Defendant Judge K. Lewis' Motion for Summary Judgment (Doc. No. 238). Both motions are considered below.

## I. Background

Plaintiff filed the instant case on August 11, 2014. Plaintiff originally named 17 defendants, including both state actors and private individuals. In plaintiff's First Amended Complaint (Doc. No. 35, filed on November 14, 2014), plaintiff alleges generally that he was twice wrongfully convicted of the murder of Catherine Robertson and other offenses in Missouri state courts, and the defendants in this matter conspired with one another to conduct a sham investigation, fabricate false evidence, and suppress exculpatory evidence for many years, resulting in plaintiff spending nearly 18 years in prison. In July 15, 2014, following successful habeas proceedings, all charges against plaintiff were dropped. Plaintiff's First Amended Complaint brings suit against 16 named defendants: (1) Lyndel Robertson (a former farming partner of plaintiff's father, husband of the murder victim, and who was also shot three times in the face and once in the right shoulder on the night of the murder); (2) Rochelle (Robertson) Koehly

(daughter of Lyndel Robertson); (3) Brandon Patrick Hagan (a/k/a Brandon Patrick Thomure, former boyfriend of Rochelle Koehly); (4) Kenneth Lewis (former State of Missouri Circuit Judge of the 43rd Judicial Circuit); (5) Gary Calvert (former Deputy Sheriff for Livingston County, Missouri); (6) Terry L. Deister (a private investigator hired by Lyndel Robertson to investigate the murder, and a friend of Gary Calvert); (7) R. Brent Elliott (former prosecuting attorney of Livingston County, Missouri, personal attorney to Kenneth Lewis, and represented the Livingston County Juvenile office in certifying plaintiff as an adult); (8) Kenneth Hulshof (former employee of the Missouri Attorney General, special prosecutor appointed to plaintiff's first trial); (9) John Williams (former employee and farming partner of Lyndel Robertson); (10) David Miller (a police officer and member of the Chillicothe Missouri Police Department); (11) the Livingston County Sheriff's Department; (12) Livingston County; (13) the City of Chillicothe Police Department; (14) the City of Chillicothe; (15) Rachel Smith (prosecuting attorney at plaintiff's second trial) and (16) Jenny Smith (a member of the Missouri State Highway Patrol).

Following the Court's orders on various plaintiffs' motions to dismiss, as well as stipulations of dismissal filed by various parties, the only remaining defendants in this case are the estate of Judge Kenneth Lewis (who died in 2016) and Kenneth Hulshof. The following claims remain pending against Lewis and Hulshof: **Count I**, 42 U.S.C. § 1983, Destruction and/or Suppression of Exculpatory Evidence, under the 5th and 14th Amendments; and **Count IV**, 42 U.S.C. § 1983 Conspiracy to Deprive Constitutional Rights. Defendant Hulshof argues that (1) the allegations made against him in the complaint lack admissible evidence; (2) even if there were admissible evidence, he is entitled to absolute prosecutorial immunity as to his preparations and presentation of

evidence before the grand jury and during Woodworth's first trial; and (3) as to the limited communications between Judge Lewis and him in the two-day period before Hulshof being appointed special prosecutor, those communications did not violate the 14th Amendment and he is entitled to qualified immunity as to those communications. Defendant Lewis argues that (1) the allegations made against him lack admissible evidence; and (2) even if material disputes of fact existed, he is entitled to absolute judicial immunity and/or qualified immunity as to the allegations made by plaintiff.

## II.    Facts

Catherine and Lyndel Robertson were shot November 3, 1990; Catherine died shortly after being shot, but Lyndel Robertson survived. Judge Kenneth Lewis was the presiding judge for the 43rd Judicial Circuit (where the shooting happened) from approximately 1982 to 2000.  At the time of the shooting, Doug Roberts was Livingston County Prosecuting Attorney.

On November 21, 1990, eight days after her parents were shot, Rochelle Robertson filed an adult abuse petition against Brandon Thomure (her ex-boyfriend) in the Circuit Court of Livingston County. She alleged that Brandon hit her in the past and had made "frequent harassing telephone calls to me since November 1st." She claimed she was afraid of Brandon because "he may have murdered my mother and attempted to kill my father on November 13th." The court granted the petition and entered an order of protection against Brandon Thomure.  Brent Elliott, a local attorney, represented Rochelle Robertson in the adult abuse proceeding. Immediately after the shootings Lyndel Robertson was adamant that Brandon Thomure be prosecuted for the crimes; however, it appears he changed his mind at some later time.

In June 1991, Lyndel Robertson hired Terry Deister as a private investigator to investigate the Robertson shooting. Deister also assisted Robertson in relation to a civil lawsuit Claude Woodworth (plaintiff's father) had filed against him regarding the dissolution of their farming partnership. Gary Calvert, a deputy sheriff of Livingston County, agreed to work with Deister on the investigation of the shooting and they agreed to keep Deister's involvement a secret from Sheriff Leland O'Dell.

Deister regarded plaintiff Mark Woodworth as the prime suspect as soon as he got involved in the investigation. During his first meeting with Calvert, Deister asked what focus had been given to Mark Woodworth, and Calvert replied almost none. Deister proposed shifting the focus of the investigation to Mark Woodworth, and Calvert agreed. Deister had the investigators "assume" that evidence which implicated a suspect other than plaintiff "did not exist," thereby opening up the possibility of pursuing plaintiff. Plaintiff asserts that Brent Elliott, who served as Judge Lewis's personal attorney on an unrelated legal issue in 1990, served as a consultant to the private investigation led by Deister. It appears from Deister's testimony that he talked to Elliott on a number of occasions; however, the substance of those conversations is not apparent from the record. See Doc. No. 242, Ex. 7, MW 7847-7855, 7903 (indicating that Elliott was not "paid counsel" for the investigation; however, Deister indicated that he had a "confidential relationship" with Elliott, Ex. 7 at MW 7904)). Deister did not contact Doug Roberts for advice because Lyndel Robertson and Gary Calvert believed Roberts did not know what he was doing.

At some time prior to Plaintiff Woodworth being charged, Lyndel Robertson stopped by the Livingston County Prosecuting Attorney's office to see how the case was going and spoke to prosecutor Doug Roberts. Robertson testified that Roberts told him

4

that there was not sufficient evidence to go forward with charges against Mark Woodworth and that he was not going to pursue charges against him. Calvert and Deister told Robertson that they needed to get a special prosecutor because Doug Roberts couldn't handle the job.

On September 16, 1992, Deister wrote a letter to Judge Lewis for Lyndel Robertson to attempt to get Doug Roberts to recuse himself as prosecutor.[1] Doc. No. 242, Ex. 7 (testimony of Deister), at MW7847; Ex. 13 (testimony of Robertson), at MW7975. Robertson read and approved the letter. Doc. No. 242, Ex. 7, at MW 7848-49. In that unsigned letter, Mr. Robertson described the details of the shooting: The incident occurred "[a]t approximately midnight November 13, 1990 while my wife Cathy and myself and our four children were asleep inside our home, … someone entered our home shooting both my wife any myself." Cathy Robertson "was shot twice and apparently died without waking." Robertson stated that he "didn't realize we were being shot" and "only remember[ed] looking at [his] wife and seeing blood all over her" and "feeling terrible." Robertson further stated that he had hired Terry Deister as a private investigator to assist Gary Calvert of the Livingston County Sheriff's Department in the investigation of the shooting of himself and his wife. The letter further stated that through the "combined efforts" of Deister and Calvert "a suspect was developed" and alluded to rumors that his "business partner was a suspect in this murder case." He also made derisive comments about Livingston County Prosecutor Doug Roberts. See Doc. No. 242, Ex. 15 (unsigned letter dated September 16, 1992).

---

[1] There is no indication that this letter was sent to or received by Judge Lewis from the record; the only copy of the letter is an unsigned document appearing at Doc. No. 242, Ex. 15. Thus, it is unclear to this Court how this could be considered Brady material that defendants Lewis or Hulshof should have provided to plaintiff.

5

One year later, Deister prepared another letter to Judge Lewis for Lyndel Robertson that criticized Roberts and urged Lewis to convene a grand jury. In that letter, dated September 24, 1993, Mr. Robertson stated in full:

> After talking to Prosecuting Attorney Doug Roberts, I feel he should be released of his duty in my particular case.
>
> I feel he is not giving this case his full attention. Gary Calvert and my private investigator have spent countless man hours on this case. All the evidence was compiled and presented to Doug Roberts in written reports in July of 1993. It is now going on two (2) months since he received this and he has not been in touch with me as promised. I know Mr. Roberts does not feel that this case is any more important than any other case he has in front of him, as he clearly stated in his letter to me dated July 27, 1993, which I received after I personally spoke with him in his office.
>
> This has be [sic] a constant disruption in my life since November of 1990 when it all started. My children and I would like to be able to put this bad memory in the back of our minds, knowing the law had done everything in their power. Until this time, I do not feel justice has been served and my life is at a standstill.
>
> I am pleading with you to act upon this, within your power, to have this case presented before a Grand Jury.

Doc. No. 292, Ex. 3. After receiving the September 24, 1993, letter from Robertson, Judge Lewis summoned Doug Roberts to his office and handed him a copy of the letter. Ex. 7, at MW 7742.

In response, in a letter dated October 5, 1993, Doug Roberts wrote to Judge Lewis in regards to the Robertson matter, stating in full:

> It has come to my attention that the complaining witness in this matter has requested you disqualify me for "lack of enthusiasm". Mr. Robertson confuses my desire to make a thorough review of all the reports in this case with a lack of enthusiasm. I can understand his frustration, but recall that soon after this crime, Mr. Robertson was adamant that we charge another young man. Had his decision been rubber-stamped by this office, an innocent person might have been prosecuted.
>
> A "lack of enthusiasm" is not grounds to seek, nor order, the disqualification of a prosecuting attorney. For me to accede to his request

invites the establishment of a dangerous precedent. However, I recognize that cases of this magnitude may justify unique approaches.

The appropriate disposition of this matter requires that the prosecuting official have the confidence of, as well as confidence in, the complaining witness. This I do not have.

Therefore, I disqualify myself in this matter and respectfully request you appoint the office of the Attorney General to represent the State of Missouri.

Doc. No. 226, Ex. C, p. 4.

Lewis testified in 2011 in relation to Plaintiff Woodworth's post-conviction proceedings that that Roberts "was wrong" to conclude that there was insufficient evidence to proceed to a grand jury against Mark Woodworth, given that two juries had found Woodworth guilty beyond a reasonable doubt and a grand jury found him guilty by probable cause. Ex. 1, at MW3198. On October 7, 1993, Lewis convened a grand jury to investigate the murder of Catherine Robertson and assault of Lyndel Robertson. Lewis was prompted to bring about a grand jury inquiry based on Lyndel Robertson's September 24, 1993, letter.

Defendant Hulshof testified that after receiving the October 5, letter from Roberts, Defendant Judge Lewis initiated a phone call to the Office of the Attorney General and AAG Hulshof was asked by his secretary if he would take that call. Hulshof testified that during the phone call, Judge Lewis asked how cases were assigned and AAG Hulshof advised Judge Lewis that case assignments were made on a rotation between him and another assistant attorney general. Doc. No. 226, Ex. H, pp. 12:24 to 13:8; p. 17:15-25. During the conversations between Lewis and Hulshof before the Attorney General's Office was appointed special prosecutor, Lewis discussed the fact of this case with Hulshof and expressed his desire for Hulshof to handle the case. Doc. No. 242, Ex. 1, at

MW3183-84; Ex. 2, at MW6110-11. Specifically, Hulshof testified that Judge Lewis indicated during the phone call that he would prefer AAG Hulshof to take the case because Mr. Hulshof had spent time in Livingston County on previous criminal matters and was familiar with local law enforcement officials. Doc. No. 226, Ex. H, p. 13:9-13.

Defendant Hulshof provides an affidavit he had no specific knowledge of the case or any discussion with law enforcement officials about the crime or any investigation before he received the assignment from Jack Morris, the unit chief for the Criminal Division within the Office of the Missouri Attorney General.[2] Doc. No. 226, Ex. N, ¶¶ 1, 5-6. Hulshof testified that Judge Lewis also mentioned during the October 5 phone call that the Robertson shootings occurred on November 13, 1990, and there was some discussion about soon-to-expire statutes of limitation which might apply, but not with the detail set out in Judge Lewis's October 7, 1993 letter. Doc. No. 226 (Ex. C); Ex. H, pp. 15:22 to 16:10; 17:7-25. AAG Hulshof testified he recalled no other discussions with Judge Lewis before Hulshof presented evidence before the grand jury. Ex. H, pp. 24:23 to 25:1. Plaintiff notes, however, that Lewis via letter to Hulshof stated he had various conversations with Hulshof regarding the case. Doc. No. 226, Ex. C-1; Doc. No. 242 Ex. 2, at MW6118.

Judge Lewis issued an order on October 7, 1993, appointing the Office of the Missouri Attorney General as special prosecutor in connection with the Robertson

---

[2] Plaintiff disputes this fact, citing the testimony of Judge Lewis wherein he purportedly testified that he discussed the facts of the case with defendant Hulshof. See Doc. No. 242, p. 5. However, when one reviews Judge Lewis's actual testimony, he stated that when he spoke to Hulshof, he discussed "[j]ust the fact of this case and probably scheduling a hearing on - - on when he would appear before the grand jury." Doc. No. 242, Ex. 1, p. 4. Judge Lewis further testified that, "I did not discuss, as far as I know, any details of the case . . . ." Id. Discussing the fact that a case exists is quite different than discussing the facts of a case; consequently, the Court does not credit plaintiff's attempt to controvert this fact.

shootings. Doc. No. 226, Ex. C, p. 3. Hulshof's affidavit provides that Kenneth Hulshof was selected by Assistant Attorney General Jack Morris and assigned as the special prosecutor by the Office of the Missouri Attorney General. Doc. No. 226, Ex. N, ¶ 1.

Judge Lewis sent a letter on October 7, 1993, to defendant Hulshof.   In Judge Lewis' letter of October 7th, he enclosed a copy of his order appointing the Office of the Attorney General appointed special prosecutor. Ex. C, p. 3. Judge Lewis also attached to his October 7th letter to Mr. Hulshof a copy of Livingston County prosecuting attorney Doug Roberts' October 5th letter disqualifying himself. Id. at p. 4. Lewis's letter also enclosed Mr. Robertson's September 24, 1993, letter to Lewis. Doc. No. 242, Ex. 3, at MW2993. (These three letters, dated September 24, 1993, October 5, 1993, and October 7, 1993, are collectively known as the "Lewis Letters.) Judge Lewis' October 7, 1993 letter to Hulshof states, in full:

> In accordance with our various telephone conversations, I am enclosing a certified copy of Order Appointing Special Prosecuting Attorney whereby I have appointed the Office of the Attorney General to prosecute the case involving the murder of Catherine J. Robertson and the felonious assault on Lyndel Robertson.
>
> I convened a grand jury in Livingston County this morning.  I enclose a copy of a letter from the surviving victim dated September 24, 1993, which prompted me to bring about a grand jury inquiry.  Also enclosed is a copy of Mr. Roberts' letter of October 5, 1993, disqualifying himself in the matter, albeit in a rather roundabout manner.
>
> To say that Doug Roberts has been uncooperative would be a monumental understatement.  He boycotted the grand jury proceedings this morning, which is simply unheard-of in my experience.[3]
>
> As we had discussed, I recessed the grand jury until Friday, October 15, 1993, at 10:00 a.m. when you said you could be here.

---

[3] Plaintiff notes that Doug Roberts testified that he did not boycott the grand jury, but rather Judge Lewis did not invite him to attend.  Doc. No. 242, Ex. 7, at MW7747-48.

One final point, the incident in question occurred on November 13, 1990. Therefore, the statute of limitations will run in just over a month on the felonious assault, burglary in the first degree and armed criminal action charges. This was another reason that I felt we could wait no longer for Mr. Roberts to act.

I wish to express my sincere thanks to your office for agreeing to take on this case. Please let me know if there is any other information which you may need at this time.

Doc. No. 226, Ex. C, pp. 1-2.

Before appearing at the grand jury, Hulshof reviewed the investigative file. Hulshof understood that Roberts had no desire or intention to present the case to the grand jury and that Lyndel Robertson was an "insistent victim" who was "very adamant that his case go forward." Hulshof did not speak with Doug Roberts about the case at any time, and did not know what evidence law enforcement officials or Mr. Robertson had provided to Doug Roberts. Prior to the grand jury proceeding, Hulshof knew that Deister was a private investigator working for Mr. Robertson and that Deister had been involved in the criminal investigation. This was the only case Hulshof prosecuted where the victim had hired a private investigator, a circumstance Hulshof recognized was "pretty unusual." Hulshof testified that "there are a number of issues that could be raised by having non-law enforcement involved in a criminal matter." Doc. No. 242, Ex. 13, at MW8160. Hulshof understood that one of the reasons Calvert had retained Deister was to work on a fraud action that Claude Woodworth (Mark's father) had filed against him. Hulshof also recalled that there was a question about chain of custody because he believed Deister may have supplied the revolver.

On October 15, 1993, AAG Hulshof first appeared before the grand jury in his role as the appointed special prosecutor. Judge Lewis personally addressed the grand jury on October 15 as well. Judge Lewis stated that "the convening of a grand jury at

this time is necessary to the effective administration of justice in Livingston County." Lewis said he was very disturbed by a newspaper article indicating that the grand jury was meeting about the Robertson murder case. He said prosecuting attorney Doug Roberts admitted telling the reporter that the grand jury was meeting but denied telling the reporter that the Robertson case was being focused upon. Lewis stated that the newspaper article "attempted to acquit Mr. Roberts of any disclosure of the purpose of this investigation" and that "Mr. Roberts makes the same denial." Lewis told grand jurors that Roberts' denials reminded him of the "line from Shakespeare when he said, 'The lady doth protest too much', referring to innocence." Doc. No. 242, Ex. 18.

At the grand jury proceeding, Hulshof presented evidence against only Mark Woodworth. Hulshof called Deister as a witness in the grand jury proceeding and questioned him. A court reporter was present and taking notes of the testimony during the entire presentation of evidence against Mark Woodworth; however, the only grand jury transcripts which were produced were of the testimony of Mark's mother and father, Claude and Jackie.

On October 19, 1993, the grand jury returned an indictment of Mark Woodworth to Judge Lewis charging him with murder in the first degree, armed criminal action with regard to that murder, assault in the first degree, armed criminal action with regard to that assault, and burglary in the first degree. After plaintiff was indicted, Brent Elliott represented the juvenile officer in the proceeding to certify plaintiff to be tried as an adult. Judge Lewis presided over the juvenile certification proceeding and certified plaintiff to stand trial as an adult.

Mark Woodworth's criminal attorney, Mr. McFadin, filed his appearance on behalf of Mark Woodworth on November 8, 1993. After Mr. McFadin had entered his

appearance, on November 16, 1993, Judge Lewis sent McFadin and Hulshof a jointly-addressed letter dated November 12, which indicated that Lewis was enclosing a letter he had received from Jim Johnson two days earlier. On or about November 16, 1993, Judge Lewis stated he filed in the Livingston County grand jury record three docket items: 1) an order Judge Lewis issued that a letter addressed to the Court from Jim Johnson, and all references thereto, be sealed and kept separate and apart from the official court file; 2) Mr. Johnson's letter, and 3) Judge Lewis letter jointly-addressed to Mr. Hulshof and Mr. McFadin. Ex. G. (The Order and the letters from Judge Lewis and Mr. Johnson are collectively known as the "Johnson Letters.") Plaintiff, however, disputes that the docket sheet and the order sealing the Johnson letter were filed because neither document is file stamped.

In 1993 Doug Roberts filed an application to revoke the probation of Jim Johnson for 3 counts of passing a bad check, a class D felony. The case is styled State v. James Johnson, Case No. CR792-12FX, Circuit Court of Livingston County. Doc. No. 242, Ex. 25, at MW2180. Judge Lewis presided over the probation revocation proceeding, and Richard McFadin, who would later represent Mark Woodworth, represented Johnson. On August 30, 1993, Judge Lewis revoked Johnson's probation and sentenced Johnson to five years' imprisonment on the three felony counts with each sentence to run concurrently with each other and concurrently with sentence imposed by the Circuit Court of Daviess County in Case No. CR391-20F but consecutively with sentences imposed by the Associate Division of the Circuit Court of Daviess County in Case Nos. CR493-223M and CR492-818F. Doc. No. 242, Ex. 25, at MW2150-51. After Lewis revoked his probation, Johnson wrote to him. In the letter dated November 12, 1993, Johnson stated that he wanted to let Lewis "know some things that might help in the

Mark Woodworth cases." Doc. No. 242, Ex. 26. Johnson claimed he "know[s] more about the Woodworth and Robertson farm's [sic] anyone" and that Claude and Mark Woodworth helped him steal chemicals. Doc. No. 242, Ex. 26. He stated that two prosecutors wanted his cooperation to prosecute Claude for chemical thefts that occurred in June and July 1993. Id. Johnson expressed his belief that Mark Woodworth had "done the shootings" but that "Claude [Woodworth] helped him and also talked him into it." Johnson further stated that Katherine Robertson's death was connected to the farm thefts. Johnson stated that he had "never snitched on anyone before" and did not know "if this is the thing to do, but I want to change my life for the best or just end it." Id.

Johnson also wrote a letter to the Livingston County Grand Jury in February 1994. In that letter Johnson represented that he could "shed some light on the Robertson murder." Doc. No. 242, Ex. 27. Johnson went on to state in that letter: (1) "I have dealt with Claude Woodworth and Lyndel Robertson since 1980 and help them steal beans—milo—chemicals as recently as July 1983"; (2) "I have had conversations with Claude Woodworth about the murder of Mrs. Robertson that will shed some light on the facts concerning the murder"; (3) "Claude Woodworth set up place's [sic] for me and four other people from this county to rip off so he could buy the stolen good's [sic] and Claude Woodworth did buy it along with 3 other people of this county. Recent as 1983 (July)"; (4) "Claude Woodworth tried to purchase a gun from me just after the Robertson murder. Claude stated to me it (gun) had to be unmarked so no one could trace it back to it's [sic] owner"; and (5) "I feel without the grand jury non [sic] of these cases would have been solved and at this time I will talk with you. I will make only one promise to you and that would be it. #1 I will tell you the truth and nothing but the truth if you will give me this chance." Doc. No. 242, Ex. 27. The foreman of the grand jury provided

Judge Lewis with Johnson's letter. On March 7, 1994, Judge Lewis sent Johnson's letter to Hulshof. The cover letter transmitting the letter does not indicate a copy of Johnson's letter was mailed to plaintiff's defense counsel.

In a handwritten note dated December 21, 1993, following a pretrial conversation with plaintiff's defense attorney McFadin, Hulshof wrote:

> "trying to get off the hot seat"
> [point finger at father?]

Doc. No. 242, Ex. 23, at MW5084; Ex. 24, at 59-62.

On September 30, 1994, Attorney James Wyrsch entered his appearance on behalf of Woodworth. As of January 1995, Mr. Woodworth's attorneys, James Wyrsch and Richard McFadin, conceded that "[a]lthough [d]efendant has had discovery of the State's file in large degree, [d]efendant is without sufficient knowledge of the facts concerning the above alleged acts to enable him to prepare his defense with the exception of the firearm." Ex. K, p. 2, No. 4. Notably, Mr. McFadin moved his office after Wyrsch had entered his appearance on Mr. Woodworth's behalf and McFadin was thereafter "unable to locate some of the discovery which has previously been produced." Ex. L (2/7/95 ltr from Wyrsch's paralegal to G. Calvert). Before Mr. Woodworth's first trial, his attorneys petitioned the trial court for a writ commanding that James Johnson (of the "Johnson Letters") be present for trial. Judge Lewis did not preside over Mark Woodworth's criminal trials.

Plaintiff argues that Mr. Robertson's September 24, 1993 letter, Doug Roberts' October 5, 1993 letter, and Judge Lewis's October 7, 1993 letter (the "Lewis Letters") were not produced to Mark Woodworth's defense attorneys in the criminal case, noting that Hulshof had no direct recollection of producing those three letters, and that the

letters did not bear numbers indicating that they had been produced to the defense during discovery. Hulshof acknowledged that the letters would be <u>Brady</u> material, and that if they had not been turned over it would have been a "big deal."

At plaintiff's first criminal trial Robertson stated he did not remember telling anyone he had seen who had shot his wife, further testifying that he had not seen a thing at the time of the shootings. Doc. No. 242, Ex. 28, at MW0489, p. 447:1-3. Shortly after the shooting, however, in 1990, Robertson stated he was almost 100 percent sure Brandon Thomure shot him and his wife. Doc. No. 242, Ex. 29, at MW3005. Mr. Robertson later told Deputy Sheriff Calvert that he thought Claude Woodworth might have done it because he is "the only one that had a reason to," or that Claude Woodworth ordered Mark Woodworth to shoot him. Doc. No. 242, Ex. 14, at MW5789, MW5792. In his 1995 deposition, Lyndel Robertson claimed that he never "point[ed] my finger at anybody" when asked by Officers Lightner and Smith at Research Hospital, but also noted that the question was always who could have possibly done it. Doc. No. 242, Ex. 30, at MW5682. Plaintiff argues that Hulshof, who was present at the 1995 deposition, did not correct Robertson's testimony which plaintiff asserts contradicts Robertson's prior insistence that Doug Roberts prosecute Brandon Thomure for the crimes as Roberts stated in his October 5, 1993, letter to Judge Lewis. Ex. 30, at MW5640-41.

Robertson did not attempt to have Claude Woodworth charged with the shooting because there was no evidence against him; however, Robertson expected Mark Woodworth to implicate his father following his conviction. Plaintiff also presented testimony at his post-conviction hearing that during jury deliberations at the first trial, Ronald Motley (a relative of plaintiff Woodworth) approached Defendant Hulshof outside

15

the courtroom and asked him "if he really believed that Mark Woodworth had committed the crime." Doc. No. 242, Ex. 7, at MW7668-69. According to Motley, Hulshof responded "oh, no," and said that "someone else had done it and he thought they [the guilty party] would step forward if Mark was prosecuted." Doc. No. 242, Ex. 7, at MW7669. Another person who overheard the exchange (and who was also a relative of Woodworth) recalled that Hulshof said "he knew Mark didn't do it, but he thought if we got this far, that the guilty party would confess." Doc. No. 242, Ex. 7, at MW7672-73.[4]

Plaintiff was convicted by a jury in 1995 of murder in the second degree, burglary in the first degree, assault in the first degree, and armed criminal action. The jury recommended the minimum sentences. The Court ordered them to run consecutively for a total of 31 years. Plaintiff's conviction was reversed in 1997 by the Missouri Court of Appeals for the reason that Mark had been unfairly deprived by the trial court of his right to present evidence of an alternative perpetrator (Brandon Thomure).

Before the second trial, the prosecutor who tried the first case with Hulshof acknowledged the ballistics evidence is "pretty much our only evidence" and the "ballistics testimony is critical." Doc. No. 242, Ex. 33, at MW2651. He requested permission to send the state's ballistics expert to meet with another prosecution expert in England so they can "try[] to strengthen their test results/testimony." Id. The expense was "necessary," because "[t]his is a high profile long-shot-to-win case which is being followed by Court TV." Id. Plaintiff's second trial resulted in jury verdicts of guilty as to

---

[4] The Court accepts as a "fact" that plaintiff presented such testimony at his post-conviction hearing. The Court notes, however, that following the hearing, the Special Master does not appear to have relied upon such testimony in his findings. Further, this Court finds particularly dubious the proposition that the special prosecutor would tell a family member of the person on trial, during jury deliberations, that the prosecutor didn't actually believe the defendant was guilty.

the same charges, and the jury recommended the maximum sentences. The trial court ordered the sentences to be served consecutively, resulting in sentences which were the equivalent of 145 years. These convictions were affirmed by the Missouri Court of Appeals in 2001.

Plaintiff filed a state habeas corpus petition which resulted in the Missouri Supreme Court appointing a Special Master to conduct an evidentiary hearing. <u>State ex rel. Woodworth v. Denny</u>, 396 S.W.3d 330, 336 (Mo. 2013). In April 2012, the Special Master filed findings and a recommendation to the Missouri Supreme Court that Habeas Corpus relief be granted, that the conviction and sentence be vacated and that the case be reviewed by an independent prosecutor as to whether Mark should be re-tried. Doc. No. 242, Ex. 34 (Special Master's Report). The Special Master's findings in support of his recommendations including the following (among other things):

    a.    Lewis "was dissatisfied with the work of the duly elected Livingston County Prosecuting Attorney Douglas Roberts (with jurisdiction over Woodworth's criminal case) in regard to Prosecutor's Roberts' prosecution of a perpetrator for the Robertson crimes." Ex. 34, at 7.

    b.    Lewis "sought and obtained the appointment of Special Prosecutor Kenny Hulshof to conduct the grand jury and prosecute Woodworth (in lieu of the same being prosecuted by Douglas Roberts)." Ex. 34, at 7.

    c.    Lewis "selected the foreperson of the grand jury, John Cook." Ex. 34, at 7.

    d.    Elliott "represented Judge Lewis, on a personal basis, in one or more civil matters." Ex. 34, at 8.

    e.    Elliott "represented Juvenile Officer Gam [sic] in the juvenile proceedings to certify Woodworth as an adult." Ex. 34, at 11.

    f.    In the juvenile certification hearing, "Judge Lewis, who presided over the hearing, was simultaneously being represented by the lawyer [Elliott] that represented the Juvenile Office." Ex. 34, at 11-12.

    g.    In his letter dated October 7, 1993, Lewis
        i.    "acknowledges that he has previously spoken to Hulshof about the case on more than one occasion." Ex. 34, at 15.
        ii.    "acknowledges that he was 'prompted to call the grand jury' based on receiving the first letter, the letter from victim Lyndel Robertson." Ex. 34, at 15.
        iii.    "states that Prosecutor Roberts had 'boycotted' the grand jury." Ex. 34, at 15.

      iv.    "appears to have substantively analyzed the statute of limitations issues as well as the possible charges to be filed or which may be filed in the case." Ex. 34, at 15.

      v.    "states that: 'I felt that *we (emphasis added)* could wait no longer for Mr. Roberts to act,'" apparently "referring to the Office of the Attorney General and himself. Ex. 34, at 16.

h.    Lewis did not provide the Lewis Letters to Woodworth's defense counsel. Ex. 34, at 17.

i.    "The Lewis Letters make it clear that the surviving victim had complained to the judge; that the prosecutor was possessed of evidence that the surviving victim had previously requested that some other person be charged with the offense with which Woodworth was ultimately charged; that Judge Lewis was in a rift with Prosecutor Roberts; and that Judge Lewis was knowledgeable about the facts of the case and was sharing that knowledge." Ex. 34, at 17.

k.    "A conflict [of interest] existed between McFadin's representation of Woodworth and McFadin's simultaneous representation of Johnson." Ex. 34, at 22.

l.    "[S]ome or all of the Johnson letters ultimately received by Hulshof (either directly or from someone else) were only first discovered by the Defense during the course of this habeas corpus action in March, 2011." Ex. 34, at 23. [5]

m.    "McFadin's simultaneous representation of Jim Johnson and Woodworth conflicted with McFadin's duties of loyalty and full disclosure to Woodworth. It must be presumed that Woodworth's representation suffered as a result of the conflict." Ex. 34, at 23.

n.    "[T]here was nothing fundamentally fair about the investigation of the Robertson crimes, or, in turn, Woodworth's prosecutions and convictions for those crimes…. Woodworth's verdict is not worthy of confidence." Ex. 34, at 30.

o.    "Woodworth's constitutionally guaranteed judicial process was ignored. Caught up in his quarrel with Prosecutor Roberts, Judge Lewis lost sight of his judicial sense of fairness. In effect, he became a prosecutor. He analyzed the crimes with which to charge Woodworth and the Statutes of Limitation for those crimes; he called a grand jury based upon an ex parte letter that he got from one of the victims…; he gratuitously criticized Roberts before the grand jury, setting an improper tone for a fair grand jury process; he appointed a grand jury forem[a]n with whom he had, at a minimum, a prior business relationship; he presided over the juvenile certification hearing wherein the Juvenile Officer was represented by an attorney who, at the same time, personally represented him; and, then, when disqualified, he designated the judge who would ultimately preside[] over the ensuing trials. It is inconceivable that each of these actions was simply an isolated, unrelated event; they hold the trappings of a case-

_____

[5] Note, however, that the letter from Judge Lewis enclosing the Johnson letter from 1993 specifically states it is being mailed to defense counsel McFadin.

specific, professionally unacceptable, pattern and practice." Ex. 34, at 32-33.

p.    Lewis demeaned Prosecutor Roberts by "accus[ing] Roberts of 'boycotting' the grand jury in his letter to the Attorney General (when he knew that Roberts had already disqualified himself from the case) and "vilifying Roberts in front of the grand jury." Ex. 34, at 32. "The accusation and the vilification added to the momentum of the prosecution…no one with an inkling of due process was in control at that time." Ex. 34, at 32. "Judge Lewis' message to the Office of Attorney General was clear: this Court was 'oh so offended by the actions of the duly elected prosecutor and that it was now time for a 'real' prosecutor to step up to the plate…join the team." Ex. 34, at 32. "At the same time, it sent a like message to the Grand Jury that 'things may have been out of control but I've taken charge' now and we've got some professionals in here and so let's get out there and get 'em, team…and that's what they did: they indicted Mr. Woodworth." Ex. 34, at 32.[6]

In January 2013, the Missouri Supreme Court accepted the findings of the Special Master and vacated Mark's conviction. State ex rel. Woodworth v. Denny, 396 S.W.3d 330 (Mo. 2013). After the Attorney General announced its decision to retry the case for a third time, the case was assigned to the Judge Owens Lee Hull, Jr. of the Circuit Court of Platte County. Judge Hull ordered the Office of the Missouri Attorney General removed from the case, concluding: "Given the history of this case, at this point in time there is absolutely no reason the office of the Attorney General should prosecute this case. Therefore it should be removed from that obligation. Justice, fairness, and the requirements of due process of law require an independent review of this case by a

---

[6] The Court notes that defendants controvert these facts in their entirety, as they are either factual contentions recited in a legal opinion or are conclusions of law, rather than materials of record as required by Rule 56. However, the Court finds that the findings and statements of the special master are relevant at least insofar as considering the procedural posture of Mr. Woodworth's case and how he came to be released from prison. As noted by defendants, though, the Court cannot conclude as a matter of fact or law based on the Special Master's report, that defendant Lewis "vilified" Roberts before the grand jury and thereby added "momentum to the prosecution".

prosecutor unburdened by past participation in this case." Doc. No. 242, Ex. 35, at MW3056.

After a hearing, Platte County Circuit Judge Hull excluded all ballistics evidence because the chain of custody documents did not document that Deister had been in possession of the bullet. Doc. No. 242, Ex. 36, at MW3059-67. The court found that the record "does not establish a complete, transparent, credible provenance of the 'Robertson bullet.'" Ex. 36, at MW3066. On February 25, 2014, Judge Hull appointed Don Norris as special prosecutor. Doc. No. 242, Ex. 37. After reviewing the record, Special Prosecutor Norris concluded that there was no credible evidence against Mark Woodworth and that Mark Woodworth had been targeted for prosecution.  Norris dismissed all charges against Mark Woodworth, finding no probable cause existed for his prosecution.

## III.    Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–90 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted).

For qualified immunity cases, however, "once the predicate facts have been established, … there is no such thing as a 'genuine issue of fact' … The conduct was either 'reasonable under settled law in the circumstances,' or it was not … ." Pace v. City of Des Moines, 201 F.3d 1050, 1056 (8th Cir. 2000) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991)) (citation and alterations omitted). The "predicate facts" include only the relevant circumstances and the acts of the parties: conclusions or arguments about the *reasonableness* of those circumstances or those actions are *not* genuine disputes of material fact that would preclude summary judgment. Id.

## IV.   Discussion

### A.   Count IV (Conspiracy pursuant to 42 U.S.C. § 1983)

#### 1.   Defendant Hulshof

In the operative Complaint, plaintiff alleges in Count IV that Mr. Hulshof conspired and "agreed to fabricate evidence against [him] so as to conceal or suppress evidence against the actual perpetrator(s)." Doc. No. 35, ¶ 167. Defendant argues that the alleged factual basis of the conspiracy allegation is that in a series of telephone calls occurring before Hulshof was appointed, Lewis recruited Hulshof and Hulshof agreed to join the conspiracy to present a false version of the facts (including that Lyndel had not

previously identified or demanded the prosecution of Brandon, and suppressing evidence of Brandon as the shooter). Doc. No. 35, ¶ 69.

Defendant Hulshof notes that prosecutorial immunity shields him from suit for such activities as reviewing investigative materials, reaching charging conclusions, as well as preparing and presenting witnesses before grand jury and trial. <u>Reasonover v. St. Louis Cty., Mo.</u>, 447 F.3d 569, 580 (8th Cir. 2006) (noting a prosecutor is absolutely immune from a civil conspiracy charge when the participating in the conspiracy consists of otherwise immune acts). Thus, defendant Hulshof notes, the allegations regarding the grand jury proceedings and the prosecution of this case are barred by prosecutorial immunity.

Furthermore, with respect to the activities taking place between Judge Lewis's first phone call to defendant Hulshof and Hulshof's appointment by the attorney general's office, defendant argues that plaintiff cannot establish a meeting of the minds to deprive Woodworth of his constitutional rights through the available evidence. <u>Rogers v. Bruntrager</u>, 841 F.2d 853, 856 (8th Cir. 1988); <u>Askew v. Millerd</u>, 191 F.3d 953, 957 (8th Cir. 1999). In addition, the knowledge that others may have acted unlawfully does not mean that defendant Hulshof joined an actionable conspiracy. <u>See Bonenberger v. St. Louis Metro. Police Dep't.</u>, 810 F.3d 1103, 1109 (8th Cir. 2016). Hulshof's limited contact in the few days between October 5 and October 7, 1993 when he was appointed as special prosecutor, does not establish evidence of a conspiracy, as participation in meetings or telephone calls, without more, does not establish a reasonable inference of a conspiracy. <u>See Larson by Larson v. Miller</u>, 76 F.3d 1446, 1455-56 (8th Cir. 1996). Further, even if Judge Lewis had hand-picked Hulshof to be the prosecutor of this matter (even though the evidence shows that Hulshof was selected by

AAG Morris), that preference does not show that Hulshof entered into a meeting of the minds to deprive Woodworth of his constitutional rights.

In response, plaintiff makes a laundry list of assertions against Hulshof that supposedly prevent prosecutorial immunity from attaching, including: (1) allegedly procuring false statements from Lyndel Robertson (citing to <u>Fields v. Wharrie</u>, 740 F.3d 1107, 1111 (7th Cir. 2014) (where the prosecutor had procured a false statement from a prospective witness before the victim's arrest), and <u>McGhee v. Pottawattamie County</u>, 547 F.3d 922, 932-33 (8th Cir. 2008) (holding that "immunity does not extend to the actions of a County Attorney who violates a person's substantive due process rights by obtaining, manufacturing, coercing and fabricating evidence before filing formal charges, because this is not 'a distinctly prosecutorial function'")); (2) entering into a conspiracy to fabricate evidence and suppress other evidence prior to his appointment on October 7, 1993 (citing <u>Zahrey v. Coffey</u>, 221 F.3d 342, 346-47 (2d Cir. 2000), for the proposition that the nature of a prosecutor's immunity depends upon the capacity in which the prosecutor is acting at the time of the alleged misconduct, and asserting that "The inference that Hulshof was recruited for this purpose and agreed to the improper suppression or fabrication is reasonable under all the circumstances," <u>see</u> Doc. No. 242); (3) Hulshof intimidated or coerced witnesses into changing their testimony, which is not advocacy but "rather a misuse of investigative techniques," <u>Zahrey</u>, 221 F.3d at 346-47; and (4) failure to disclose the Lewis letters, which the state courts found included <u>Brady</u> material, demonstrates that Hulshof violated the codes of conduct for failure to report to the Missouri Bar alleged ex parte contacts between Judge Lewis and the victim, as well as supporting the theory that Lewis and Hulshof had agreed to suppress the information contained in those letters.

The Court finds that plaintiff's theory of the case lacks factual support in the evidentiary record. With respect to activity allegedly taken in the two-day period between the first phone call from Judge Lewis and his appointment to the case, there is no evidence on the record that defendant Hulshof did anything that could be considered entering into a conspiracy to fabricate or suppress evidence. Even if Judge Lewis had given him a factual overview of the case against Woodworth (a point which is not supported by the record), that does not mean that Hulshof agreed to suppress evidence of a different suspect. With respect to the remaining facts regarding failure to present evidence as to another suspect to the grand jury, failure to apprise the trial court of deficiencies in the ballistic evidence, or failure to correct Mr. Robertson's testimony as to alleged contradictions, those examples are more properly categorized as acts taken in good faith pursuit of conviction. There is no evidence that Hulshof intimidated or coerced others to testify falsely at trial. Finally, to the extent that Hulshof did not disclose the Lewis letters, that hardly amounts to the nefarious claim made out by plaintiff; alternate explanations could be attorney oversight or mistake, or that plaintiff's trial counsel, McFadin, received the letters but later could not find them after his office move.

In short, the lack of factual support demonstrating that Hulshof entered into a conspiracy, coupled with prosecutorial immunity, leaves the Court no option other than to grant defendant Hulshof's motion to summary judgment as to Count IV of the Amended Complaint.

### 2.      Defendant Lewis

Defendant Lewis also asserts that plaintiff has failed to provide facts supporting a Section 1983 conspiracy claim against him. In the operative complaint (Doc. No. 35),

plaintiff alleges that former defendants Robertson, Calvert, Diester, Johnson and Williams enlisted Judge Lewis to frame Woodworth, conceal the alleged conspiracy and ensure Woodworth was never freed from wrongful incarceration. Doc. No. 35, ¶ 167. Plaintiff then states that "circumstances indicate" that Lewis recruited Mr. Hulshof to "[present] a false version of the facts; namely that [Robertson] had not previously identified or demanded the prosecution of [Thomure] and suppressing evidence that [Robertson] had, in fact, previously identified [Thomure] as the shooter." Doc. No. 35, ¶ 169.

To demonstrate a conspiracy claim that survives summary judgment, plaintiff must provide factual support indicating that (1) the defendant conspired with others to deprive plaintiff of his constitutional rights; (2) at least one of the alleged co-conspirators engaged in an overt act furthering the conspiracy; and (3) that the overt act injured plaintiff. White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008); Reasonover v. St. Louis Cty., Mo., 447 F.3d 569, 582 (8th Cir. 2006). Defendant Lewis indicates that there are no material facts demonstrating that Lewis joined the alleged conspiracy with Robertson, Calvert, Diester, Johnson and Williams. Further defendant Lewis argues that the series of telephone conversations he held with Hulshof does not demonstrate a conspiracy. This Court notes that it is already found that plaintiff has not set forth evidence that Hulshof joined a conspiracy with Lewis; thus, the converse is also true: there is no evidence that Lewis conspired with Hulshof about this case. Furthermore, with respect to Robertson, Calvert, Diester, Johnson, and Williams, plaintiff's evidence of conspiracy is thin: plaintiff asserts, without evidentiary support other than "circumstances indicate", that Elliott (who had served as Lewis's attorney on an unrelated matter) kept Lewis apprised of the investigation being conducted by Diester

and Calvert. This is simply not sufficient to demonstrate a meeting of the minds between Lewis and anyone else.

Additionally, as noted by defendant, Judge Lewis has judicial immunity. Mireles v. Waco, 502 U.S. 9, 11 (1991); Martin v. Hendren, 127 F.3d 720, 721-722 (8th Cir. 1997). Absolute judicial immunity applies to protect judges from individual capacity suits for money damages when the acts taken were within their judicial capacity. Penn v. United States, 335 F.3d 786, 789 (8th Cir. 2003). Judicial acts are those acts within a judge's jurisdiction and normally performed by a judge where the complainant is dealing with the judge in his judicial capacity. Schottel v. Young, 687 F.3d 370, 373 (8th Cir. 2012). A judge is immune from suit in all but two narrow sets of circumstances. Id. citing Mireles v. Waco, 502 U.S. 9, 11–12 (1991). "First, a judge is not immune from liability for nonjudicial actions, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Id. Judicial immunity is not overcome, however, by allegations of bad faith or malice. Mireles, 502 U.S. at 11.

Here, defendant Lewis notes that the facts are that on October 7, 1993, Lewis convened and presided over a grand jury. On the same date, Lewis issued an order appointing the Office of the Attorney General of Missouri as special prosecuting attorneys in connection with the Robertson shootings. This order followed an October 5th letter from the Livingston County prosecutor, Doug Roberts, disqualifying himself and asking Lewis to appoint the Office of the Attorney General to represent the State. Lewis spoke to the grand jury on one occasion, October 15, 1993, and later presided over proceedings certifying plaintiff as an adult for trial. Lewis, upon receipt of one of the

26

Johnson letters, sent correspondence to counsel for both the state and plaintiff Woodworth, and ordered the correspondence placed under seal.

Defendant Lewis states that all the actions outlined in the preceding paragraph are judicial actions, which were not taken in the complete absence of all jurisdiction. All actions are of a nature normally performed by judges, such as presiding over grand jury and other court proceedings, issuing orders, and seeking a special prosecutor. <u>Mireles</u>, 502 U.S. at 13.

In response, plaintiff argues that the doctrine of judicial immunity does not apply to Judge Lewis because Judge Lewis engaged in prosecutorial acts which are not entitled to immunity, comparing this case to <u>Lopez v. Vanderwater</u>, 620 F.2d 1229, 1235 (7th Cir. 1980), in which the Court held that the judge was not entitled to absolute immunity because he made the decision to prosecute.[7] Here, plaintiff argues that when the county prosecutor declined to prosecute, Judge Lewis initiated a grand jury inquiry. Plaintiff further argues that Lewis "orchestrated the recusal of the sitting prosecutor and assigned the case to a special prosecutor who was willing to join the conspiracy to frame Woodworth." Doc. No. 242. However, the actual facts are not so dramatic. Instead, they show that Robertson sent a letter to Judge Lewis complaining about the prosecutor. Judge Lewis showed the letter to the prosecutor, who then recused himself. Judge Lewis then inquired about appointing the AG's office to prosecute the case, and initiated grand jury proceedings. None of these facts demonstrate that Judge Lewis

_____

[7] As noted by defendants in their reply suggestions, <u>Lopez</u> is factually distinct from the case at hand. In <u>Lopez</u>, the judge personally arrested the defendant, charged him with petty theft, and then convicted and sentenced him at approximately midnight at a police station, without a prosecutor, defense attorney, or court reporter present. 620 F.2d at 1231. Needless to say, the process afforded to plaintiff Woodworth was considerably different.

entered into a conspiracy to violate plaintiff's rights, and none demonstrate he acted as a prosecutor in this case so that he is no longer able to claim judicial immunity.

The Court further notes that, in response, plaintiff comes up with what he terms "reasonable inferences" from the evidence that show defendant Lewis joined a conspiracy. However, as noted by defendant Lewis, rather than being "reasonable inferences," these allegations a merely speculations based on Judge Lewis's October 7, 1993 letter. Plaintiff asserts that Judge Lewis presumably wanted Woodworth indicted in 1993; however, the letters sent by Lewis to Hulshof do not even name Woodworth as the alleged suspect. Plaintiff also argues that the October 7, 1993 letter supports the inference that "Hulshof had agreed to a prosecutorial approach which suppressed the evidence that Mr. Robertson had previously 'fingered' a different suspect." Doc. No. 242, p. 37. However, as noted by defendant Lewis, nothing in the letter supports such an inference. Plaintiff also notes that the letter references "various conversations" between Hulshof and Lewis before the October 7, 1993, letter. However, the mere fact that various conversations (i.e., more than one) were held does not support the inference that they conversed about the subjects plaintiff "infers," such as a conflict between prosecutor Roberts and victim Robertson, or the inference the Lewis told Hulshof he wanted Woodworth to be indicted. Again, these are not inferences based on the record, but speculation. Finally, to the extent plaintiff argues that defendants Hulshof and Lewis later somehow agreed to hide from Woodworth a conflict of interest with his trial counsel McFadin, who also represented witness Johnson (who sent letters to Judge Lewis and the grand jury), that claim is belied by the fact that (1) Judge Lewis sent a letter to both Hulshof and McFadin enclosing the first Johnson letter, and (2) Johnson was requested as a witness at trial by the defense.

28

Case 5:14-cv-06090-FJG   Document 248   Filed 03/10/17   Page 28 of 33

Therefore, for the foregoing reasons, plaintiff's Section 1983 conspiracy claim in Count IV against defendant Lewis fails, and summary judgment is granted in defendant Lewis's favor.

B.    Count I (14th Amendment Procedural Due Process) as to Hulshof and Lewis

As an initial matter, to the extent that plaintiff is seeking relief pursuant to the 5th Amendment of the United States Constitution, such relief cannot be granted because defendants Lewis and Hulshof are not federal actors.  Barnes v. City of Omaha, 574 F.3d 1003, 1005 n.2 (8th Cir. 2009).   Therefore, any 5th Amendment claims are dismissed.

1.    Hulshof

As discussed previously, plaintiff Woodworth contends that both before and after Hulshof was appointed special prosecutor, he engaged in prosecutorial misconduct. Between October 5, 1993 and October 7, 1993, plaintiff alleges that defendant Hulshof engaged in a series of telephone conversations with Judge Lewis about the case. However, there is no evidence that the conversations were anything other than Judge Lewis seeking information about appointing a special prosecutor and discussing the fact that the Robertson homicide investigation existed.  Thus, as discussed above in regards to plaintiff's conspiracy claim, there is insufficient evidence to proceed to trial regarding any of Hulshof's activities prior to being appointed special prosecutor in this case.

Furthermore, as for the pre-appointment contacts occurring between October 5th and October 7th, Mr. Hulshof is entitled to qualified immunity. The record supports Hulshof's statements that the contacts between he and Lewis from October 5 through October 7 addressed primarily administrative concerns, including the date of the

Robertson shootings relative to the running of potentially applicable statutes of limitation, as well as coordinating Hulshof's appearance before the grand jury. Doc. No. 226, Ex. C. Qualified immunity shields government officials who are engaged in discretionary activities from liability for money damages made against them in their individual capacities unless their conduct violated clearly established statutory or constitutional rights. Barton v. Taber, 820 F.3d 958, 963 (8th Cir. 2016) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is not lost by reasonable errors of judgment. Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam) (noting that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). The questions to ask in a qualified immunity case are (1) Whether a constitutional right was violated, and; (2) Whether the right was clearly established when the violation occurred. Barton, 820 F.3d at 963.

Hulshof argues that his contact with Judge Lewis over a two-day period regarding largely administrative matters before being appointed the special prosecutor of the Robertson shooting did not constitute a 14th Amendment violation in 1993, as applicable precedent did not establish that discussions a judge and potential prosecutor regarding administrative matters violated the 14th Amendment's procedural due process requirements. In response to this argument, plaintiff focuses on his unsupported assertions that during this brief period of time, Hulshof and Lewis entered into a conspiracy to suppress relevant evidence. But, there is no admissible evidence supporting plaintiff's argument that either party entered into a meeting of the minds to suppress evidence, particularly during the October 5-7 time period. The Court, therefore, finds that qualified immunity is another basis upon which to grant summary judgment as to Hulshof's acts between October 5-7, 1993.

With respect to plaintiff's allegations that Hulshof concealed and suppressed disclosure of the "Lewis letters," a violation of the 14th Amendment's procedural due process clause requires Mr. Woodworth establish that: 1) Mr. Hulshof failed to disclose evidence favorable to him, 2) the evidence was material and 3) Hulshof acted in bad faith. Brown v. Chiappetta, 806 F. Supp. 2d 1108, 1117 (D. Minn. 2011). Woodworth must demonstrate that Hulshof "intended to deprive [Woodworth] of a fair trial." White v. McKinley, 519 F.3d 806, 813 (8th Cir. 2008). However, as discussed by defendant Hulshof, there is no admissible evidence in the record that shows that Hulshof intended to deprive Woodworth of a fair trial. No credible evidence shows that Hulshof believed someone other than Woodworth perpetrated the crime.[8]

Finally, for the reasons stated above in relation to the conspiracy claim, Hulshof's actions after he was appointed special prosecutor are subject to absolute prosecutorial immunity. Williams v. Hartje, 827 F.2d 1203, 1208 (8th Cir. 1987); Anderson v. Larson, 327 F.3d 762, 768 (8th Cir. 2003). Absolute immunity covers all actions taken to initiate a prosecution, even if those actions were patently improper. Williams, 827 F.2d at 1208. Furthermore, the Brady allegations are subsumed within the protections of absolute prosecutorial immunity because that immunity extends to acts taken in pursuit of conviction. See Imbler v. Pachtman, 424 U.S. 409, 430 (1976); Reasonover v. St. Louis

---

[8] Moreover, certain evidence suggests that McFadin (who is now deceased) had received or had access to the Lewis letters and other discovery, and perhaps such discovery was lost in his subsequent office move. See Doc. No. 226, Ex. K-2 (Defense counsel McFadin acknowledging access to State's file); Ex. L-1 (McFadin unable to locate unidentified discovery previously produced); Ex. K-2 (Woodworth's counsel's admission of discovery provided). Additionally, in this matter Woodworth has refused to disclose his defense attorney McFadin's file, asserting attorney-client privilege. Defendants argue that privilege was waived by implication when plaintiff placed the alleged suppression of exculpatory materials at issue in this lawsuit. Shukh v. Seagate Technology, LLC, 872 F.Supp.2d 851, 857 (D.Minn. 2012).

<u>Cnty</u>., Mo., 447 F.3d 569, 580 (8th Cir. 2006). Prosecutorial immunity, moreover, even covers plaintiff's unsupported claims that Hulshof knew of McFadin's conflicts with Woodworth and Johnson and somehow Hulshof was secretly working in concert with McFadin to secure adverse testimony from Johnson (<u>see</u> Amended Complaint, Doc. No. 35, ¶¶ 58-59).

Accordingly, for all the foregoing reasons, summary judgment is **GRANTED** as to all claims in Count I of the Amended Complaint as to defendant Hulshof.

        2.    Lewis

In Count I of the First Amended Complaint (Doc. No. 35), plaintiff alleges that Judge Lewis failed to disclose the "Lewis letters" to defense counsel (Doc. No. 35, ¶ 147) and further concealed a conflict of interest between defense counsel McFadin and Woodworth related to McFadin's representation of witness James Johnson  These are the sole allegations that expressly state that Lewis violated plaintiff's 14th Amendment procedural due process rights.

With respect to the allegations regarding Johnson and McFadin, it appears from the record that Lewis sent McFadin copies of Johnson's letters as well as a November 24, 1993 letter from Lyndel Robertson. Lewis also entered an order in the 1993 grand jury docket, noting that Mr. Johnson's letters were sent to McFadin and Hulshof, and that the letter be otherwise sealed and kept separate and apart from the official grand jury court file. Otherwise, as discussed by defendant Lewis, there is no admissible evidence regarding the alleged conflict between Woodworth and his attorney McFadin, or whether Lewis was aware of such a conflict.

Furthermore, as noted above in relation to the conspiracy claims, judicial immunity applies to claims against Judge Lewis. <u>Mireles v. Waco</u>, 502 U.S. 9 (1991);

<u>Martin v. Hendren</u>, 127 F.3d 720, 721-722 (8th Cir. 1997). Judicial immunity is lost only if Lewis' actions were not judicial or the actions were taken in the complete absence of all jurisdiction. <u>Id.</u>  With respect to Count I, forwarding of correspondence to defense attorneys, as well as placing Johnson's letter under seal, are official actions taken within Lewis's official role as judge, entitling him to judicial immunity.  Furthermore, to the extent that plaintiff alleges that Lewis suppressed exculpatory evidence as relates to the Lewis letters, the <u>Brady</u> rule applies to prosecutors, not to judges presiding over grand juries.  Moreover, qualified immunity would apply to these claims as well, as no case law (from 1993 or otherwise) shows that judges must disclose <u>Brady</u> material to the defense, nor does case law reveal any additional duty be placed upon Lewis to further investigate any purported conflict between Woodworth and his counsel.

Therefore, defendant Lewis's motion for summary judgment as to Count I is **GRANTED**.

## V.    Conclusion

Accordingly, for the above-stated reasons: (1) Defendant Kenneth Hulshof's Motion for Summary Judgment (Doc. No. 225) is **GRANTED**; and (2) Defendant Judge K. Lewis' Motion for Summary Judgment (Doc. No. 238) is **GRANTED**.  As these were the only remaining defendants, this case is **DISMISSED.**


**IT IS SO ORDERED**.


Date:  March 10, 2017                    **S/ FERNANDO J. GAITAN**, **JR.**
Kansas City, Missouri                    Fernando J. Gaitan, Jr.
                                         United States District Judge